**2023 IL 128770**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 128770)

PML DEVELOPMENT LLC, Appellant, v. THE VILLAGE OF HAWTHORN WOODS, Appellee.

*Opinion filed June 15, 2023.*

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, Holder White, and Cunningham concurred in the judgment and opinion.

Justice Rochford specially concurred, with opinion.

## OPINION

¶ 1     Plaintiff, PML Development LLC (PML), brought an action against the Village of Hawthorn Woods (Village). PML alleged the Village breached a development agreement (Agreement) between the parties. The complaint sought damages resulting from the Village's breach, as well as an order compelling the Village to

comply with the Agreement. The Village denied breaching the Agreement and filed counterclaims alleging that PML breached the Agreement. Following a bench trial, the circuit court of Lake County found that both parties materially breached the Agreement. However, the circuit court concluded the Village's first material breach excused PML from performing its obligations under the Agreement. Therefore, the circuit court entered judgment in favor of PML on both its breach of contract claim and the Village's counterclaim.

¶ 2 The Village appealed, and PML cross-appealed. The appellate court reversed, finding that neither party could recover damages because each party materially breached the Agreement. The court reasoned that, because PML continued to perform under the contract despite the Village's breach, PML remained bound by the terms of the Agreement. When PML subsequently materially breached those terms, it could not recover damages. 2022 IL App (2d) 200779. This court granted PML's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2021). For the following reasons, we reverse the appellate court's judgment. We affirm the circuit court's judgment in favor of PML on its breach of contract claims. We reverse the circuit court's judgment in favor of PML on the Village's breach of contract counterclaims. We remand the matter to the circuit court for further proceedings.

¶ 3 BACKGROUND

¶ 4 In June and July 2012, PML prepared a set of grading plans for a 62-acre property within the Village and submitted those plans to the Village for preapproval before it purchased the property. The Village's chief administration officer and Village clerk informed PML that they had no objection to the plans, and on September 7, 2012, PML purchased the property.

¶ 5 On October 11, 2012, PML and the Village entered into the Agreement regarding the use of the property. The Agreement included the following relevant terms. Recital B limited PML to adding 1.2 million cubic yards of fill. Recital F required a drawdown deposit to be executed before commencing work.

¶ 6 The parties agreed that, upon completion of the grading project but no later than December 31, 2015, PML would donate the entire parcel of land to the Village for a total sum of $1 by warranty deed free and clear of all liens, encumbrances, and

special service area (SSA) assessments as of the date of conveyance. PML would pay all taxes while the property was in its possession, and the Village would assume responsibility for the taxes once PML conveyed the property to the Village.

¶ 7 The Agreement also allowed the property to be accessed by Kruger[1] Road. PML agreed to bring Kruger Road back up to current Village standards at the end of the project. PML would perform the reconstruction with an anticipated donation toward that reconstruction of $200,000.

¶ 8 The Agreement provided that, before work could commence, PML would present the Village engineer with all plans, studies, reports, surveys, and other materials that might be necessary under the applicable Village codes and ordinances or that might be reasonably be requested by the Village engineer. The Village engineer would then approve the final plans if those plans satisfied the applicable codes and ordinances. The parties also agreed that the grading permit would be valid for two years from the date of issuance and that, if work was not completed within two years, a permit extension would be granted for an additional two years. The Agreement required PML to establish a drawdown account, and the funds from that account would be used to pay for inspections related to the grading, filling, sedimentation and soil erosion control measures, stormwater management, perimeter landscaping, and seeding operations.

¶ 9 The Village originally approved the plans PML submitted, and PML began operations on the property in February 2013. However, the Village attempted to transform the Agreement by placing additional requirements on PML so that PML could fill and develop the land to conform with the Village's concept plan for future development of a municipal campus on the property. From March 2013 through September 2014, the Village repeatedly required PML to revise its plans without citing any Village code or ordinance violations. Instead, the Village made its demands to accommodate the Village's ever-changing concept plans. Despite this, PML sent revised plans to accommodate the Village's demands.

¶ 10 On May 4, 2015, PML filed a three-count complaint against the Village alleging the Village interfered with PML's work on the property. Count I of PML's

---

[1]PML's complaint and the development agreement spell the road's name as "Krueger"; PML's site surveys and the Village's filings reflect the spelling "Kruger."

complaint sought declaratory relief so that PML could complete its work in substantial compliance with the Agreement. Count II sought *mandamus* relief directing the Village to comply with its obligations under the Agreement. Count III alleged a breach of contract claim and sought monetary damages for the Village's breach along with a determination that PML should be excused from its obligation to convey the property to the Village. The complaint did not specifically allege that the Agreement should be terminated based on the Village's alleged material breaches.

¶ 11    The Village filed an answer, affirmative defenses, and counterclaims. The Village denied breaching the Agreement. The counterclaims alleged PML materially breached the Agreement for several reasons. Relevant to this appeal are the Village's claims that PML failed to (1) pay the property taxes on the property (count IV) and (2) fund the drawdown account, which had a $58,103.25 deficit (count V).

¶ 12    On November 17, 2015, PML filed a *mandamus* petition. PML alleged that its incentive to enter into the Agreement was the potential income to be derived from charging its customers by volume for accepting fill for deposit on the property and then using that fill to grade the property. PML asserted that the Village's misconduct had impaired any potential profit PML may have derived from the project. Specifically, the Village refused to issue the grading permit allowed under the Agreement. Instead, the Village interfered with PML's operations and attempted to force PML to comply with the Village's demands to conform the property to the Village's conceptual plan, which differed substantially from the approved grading plans. PML requested a *mandamus* order directing the Village to issue the permit as required by the Agreement.

¶ 13    In response, the Village argued that PML breached the Agreement and should not be granted *mandamus* relief. The Village alleged that PML failed to pay the taxes for the property in violation of the Agreement. Consequently, PML could no longer convey the property free and clear of liens and encumbrances due to the tax delinquencies.

¶ 14    On January 15, 2016, the circuit court granted PML's *mandamus* petition and ordered the Village to issue a permit to PML with a December 31, 2016, expiration.

¶ 15    In October 2016, the Village filed a motion to enforce the circuit court's prior *mandamus* order and compel PML to complete its work by December 31, 2016. The Village argued that the Agreement did not contemplate PML operating on the property beyond the four-year period (2012-16). PML also continued to be in breach of the Agreement by failing to pay taxes on the property. The Village claimed that PML should not be allowed to reap the benefits of the project while avoiding the court's orders and PML's obligations under the Agreement.

¶ 16    PML filed a response to the motion to enforce the court's *mandamus* order and included a cross-motion for *mandamus* relief. PML noted that the Agreement included a provision that allowed an automatic two-year extension if it had not completed the project. PML asserted that it had a right under the Agreement to continue to perform its operations and asked the court to deny the Village's request to compel PML to finish the project by December 2016. As to its cross-motion for *mandamus* relief, PML asked the court to compel the Village to issue a permit extending the expiration by two years as required by the Agreement.

¶ 17    The Village also filed a motion for summary judgment. In this motion, the Village argued that PML materially breached the Agreement by failing to pay the property taxes and, as a result, PML could no longer convey the property to the Village free and clear of all liens and encumbrances as provided by the Agreement. Therefore, the Village requested summary judgment in its favor as to count IV of its counterclaims.

¶ 18    In response to the motion for summary judgment, PML argued that the failure to pay taxes was not a breach because the project had not yet been completed and PML could still redeem the taxes.

¶ 19    The Village also filed a motion to appoint a receiver. The Village contended that PML failed to pay the property taxes and caused the taxes to be sold at a tax auction. Consequently, it would be impossible for PML to convey the property to the Village, unless PML redeemed the taxes. The Village asked the court to compel specific performance by ordering PML to redeem those taxes or appoint a receiver to redeem those taxes on PML's behalf.

¶ 20    On December 9, 2016, the circuit court extended its *mandamus* order and gave PML until December 31, 2018, to complete its work on the property pursuant to the

Agreement. The court denied the Village's motion to enforce the court's prior *mandamus* order, motion for summary judgment, and motion to appoint a receiver.

¶ 21 On August 7, 2017, the Village filed a motion for partial summary judgment on count IV of its counterclaims. Like the Village's previous motion for summary judgment, this motion was also based on PML's continued failure to pay the property taxes.

¶ 22 At a hearing on the motion, the Village argued that the Agreement required PML to pay the property taxes while PML possessed the property. Due to PML's failure to pay taxes, third-party tax buyers purchased the unpaid taxes and now had liens on the property. The Agreement required PML to convey the property to the Village free and clear of all liens and encumbrances.

¶ 23 At the hearing, the court asked the Village's counsel what its damages were, since the tax deed had not yet been issued and PML could presumably cure the tax deficiency. The Village responded that specific performance was one remedy provided by the Agreement, so damages were not required. The Village did not believe it was premature to seek relief, as it was attempting to protect its future interest in obtaining the property under the Agreement. Once the redemption period expired, it would be too late for the Village to obtain the property.

¶ 24 The court pointed out that the Agreement required PML to transfer the property no later than December 31, 2015. It asked why the property had not been transferred. According to the Village's counsel, PML had not tendered the property and could not tender the property free and clear of the tax liens as required by the Agreement. PML's counsel argued that the permit had been extended by the court's first *mandamus* order to December 2016. The court, however, noted that December 2016 had come and gone as well. PML represented that it was ready and willing to convey the property to the Village at any time but that the Village refused to accept the conveyance. PML also claimed that its failure to pay the taxes was caused by the Village's interference with its operations on the property.

¶ 25 During the argument the court commented that the parties were in a unique situation:

"[W]henever there's a breach of a contract, people basically say, Okay, we're done, I'm not going to do my portion; he's not—the other side's not going to do—you guys are still operating under this contract, that it's still valid and everybody owes everybody all the obligations and responsibilities under the agreement. I mean, it's not like you said, Oh, you know, you breached, we're stopping, we're going to sue you, we would have made X dollars if we would have continued to the end of the term. You're still operating. They're still going there and checking to see if you're in compliance with the ordinance and everybody's operating as if this is still a valid un-breached contract ***."

PML's counsel responded, "Well, isn't that to our benefit?" The court believed this was a factual question and asked PML's counsel why it should receive the benefits of the contract but not the Village, since both parties sought specific performance. The court asked PML's counsel if PML was still operating under the contract, and counsel responded, "Right." Counsel explained that PML continued its operations to mitigate damages and that the property could lose value if it stopped its operations. The court noted that PML could operate to mitigate its damages but that it could also terminate the Agreement and claim damages for the profits it expected to generate had it continued performing.

¶ 26    PML's counsel explained that PML could convey the property within a day's notice, but the Village would not accept the conveyance due to the outstanding property taxes. The Village's counsel answered:

"You know. This is a unique situation where we have a trial in less than two weeks on a contract that's going to be continued to be performed until 2018, and you know, that's I think unique as well, because we have now additional tax buyers *** out there who have the ability to perform as it relates to tax deeds.

So are we going to have a trial and then, you know, they're going to continue to perform until 2018 and then lose the property, you know, in that interim period?"

The court raised concern about the damages being potentially speculative:

"The other thing that it makes difficult I think at some point, I mean, you're going to tell me what your damages are potentially as of October 23 or whenever we finish the trial this year, but you're right, you're going to still be operating and you could all of the sudden become the most popular fill dump place in the county and get more business than you ever thought you would get and make more money than you thought you would ever make ***."

¶ 27    Ultimately, the circuit court granted the Village's motion for partial summary judgment in part. The court explained:

"The motion for summary judgment as to Count 4 for failure to pay the taxes, I'm in a quandary on this one ***.

I think that I can partially grant your motion because I think that there is no genuine issue of material fact that there has been a breach based on the failure to pay taxes given the fact that there was a turnover date of title prior to when this became an issue even though it's been extended. I don't think there's a genuine—I don't think that there's no genuine issue of material fact whether, in fact, they can comply with that, whether they can do specific performance. I don't know anything about their financial information, whether they, in fact, have the money to redeem the taxes or not.

I think to order them to do that without having information whether that is valid or if your remedy is a breach of contract instead of specific performance, I think that's an issue that has to be reserved for trial.

So to the extent that we'll take an issue out of the litigation here, I am going to find that there was a breach for failing to pay the taxes no later than what the turnover date was contemplated, whether it was December—the end of December 2015 or the extended date in 2016. At this point, that date has come and gone and that may eliminate some evidence that's presented at trial ***.

* * *

*** As everybody has noted, there have been allegations of breaches back and forth and I'm going to have to make a determination probably who was the original at fault to see how the things are going to shake out at the end of the day.

So, no, [PML is] not going to be precluded from saying, you know, here's the reason why. I'm merely taking this issue out that, in fact, I think was a contested issue that you didn't have to pay the taxes yet. And I think the deadline for payment of taxes based on what's in the agreement has come and gone and [PML is] in breach of that. Whether there's an excuse for it or not, I have not made a determination of that."

¶ 28 Prior to trial, both parties submitted pretrial memorandums to the court. Both parties agreed that the Agreement was binding and enforceable. Each party asserted that it performed its obligations under the Agreement but claimed the other party should be liable for its alleged breach. The Village's memorandum added the allegation that PML breached the Agreement by failing to reconstruct Kruger Road as required by the Agreement.

¶ 29 The cause went to trial on November 20, 2020.

¶ 30 After trial, the parties submitted posttrial memorandums. In PML's posttrial memorandum, PML maintained that the Agreement was valid and enforceable and that it performed its obligations under the Agreement. PML alleged that the evidence showed that the Village materially breached the Agreement by (1) failing to issue the proper grading permit, (2) imposing obligations on PML that were not part of the Agreement, and (3) interfering with PML's means and methods of developing the property. PML also asserted that any claimed breach as to the drawdown account and Kruger Road reconstruction occurred after the Village materially breached. Thus, the Village could not recover. In addition, the Village hindered PML's performance and caused PML's inability to pay the taxes on the property. Further, the Village failed to mitigate its damages by rejecting PML's offers to convey the property to the Village.

¶ 31 In the Village's memorandum, it claimed that it performed its obligations and alleged that PML breached the Agreement by failing to (1) convey the property to the Village, (2) fund the drawdown account, and (3) reconstruct Kruger Road. As to damages, the Village argued that PML's inability to convey the property frustrated the main purpose of the Agreement, the Village suffered damages based on PML's failure to fund the drawdown account, and the Village suffered damages in excess of $200,000 caused by PML's failure to restore Kruger Road. The Village asked the court to order PML to convey the property to the Village by warranty

deed free and clear of all liens and encumbrances "in full compliance with the terms of the Development Agreement," reconstruct Kruger Road, pay the amounts owed under the drawdown account, and pay the Village's attorney fees. The Village did not request monetary damages caused by PML's failure to convey the property.

¶ 32        Prior to judgment, the Village filed a motion to reopen proofs. The motion asked the court to take judicial notice of the tax deed, quitclaim deed, and Lake County property tax records, which showed that one of the parcels comprising the property had been conveyed to a third party by quitclaim deed. The Village did not ask the court for a hearing on damages caused by PML's failure to convey the property. However, the Village asked the court to take judicial notice of these records to the extent the new evidence would impact the court's upcoming judgment and the relief it awarded. Subsequently, the parties entered an agreed stipulation of these facts, and the Village withdrew the motion as moot.

¶ 33        The circuit court entered a written judgment, which included detailed factual findings and legal conclusions. The court found "[e]ach party accused the other party of materially breaching the Development Agreement, but neither party stopped the development of the Property from proceeding even after PML filed its lawsuit against the Village in 2015."

¶ 34        As to the Village, the circuit court found the Village materially breached the Agreement in three ways. First, the circuit court found that the Village materially breached the Agreement by refusing to approve PML's grading plans and issue the appropriate grading permit. The Agreement required the Village to approve PML's final grading plans and issue the grading permit once PML submitted all plan studies, reports, surveys, and other materials that might be necessary under the applicable Village codes and ordinances or that might be reasonably requested by the Village engineers. However, neither the Village nor the Village engineers told PML that the grading plans violated any specific code or other regulatory provision. Therefore, the circuit court determined that the plans were code compliant. Pursuant to the Agreement, the Village should have issued the initial grading permit in February 2013, but the Village did not issue the grading permit until December 15, 2014. Additionally, the permit issued by the Village violated the Agreement and required the court's intervention. The grading permit should have been for a two-

- 10 -

year period as required by the Agreement, but the Village only issued a nine-month permit.

¶ 35     Second, the court found the Village materially breached the Agreement by imposing obligations on PML that were not bargained for and not part of the Agreement to obtain concessions from PML. The court based this finding on the Village's continued refusal to issue the required permits to PML. The Village also issued at least six improper stop work orders.

¶ 36     Third, the court found the Village materially breached the Agreement by failing to allow PML to dictate the means and methods of developing the property through the Village's use of earth change approvals. Because the Village did not have its municipal concept plan finalized, it only issued earth change approvals to force PML to work in areas that the Village believed would not have any buildings, roads, parking areas, or bike paths.

¶ 37     The court found the Village's earth change approvals illogical because it required PML to deposit fill in front of the Kruger Road entrance. The work sequencing forced onto PML by the Village contributed to poor site conditions and sediment being tracked onto Kruger Road and long lines of trucks waiting on Kruger Road to deposit fill. This caused PML to perform unnecessary work to move the mountain of fill that accumulated at the entrance.

¶ 38     As to PML, the circuit court found that PML materially breached the Agreement in three ways. First, the Agreement required PML to fund a drawdown deposit account. The drawdown account had a deficit of $53,103.25 as of June 2015. The court found that the charges debited against the account were authorized charges under the terms of the Agreement. PML's failure to fund the account constituted a material breach of the Agreement.

¶ 39     Second, the Agreement also required PML to reconstruct Kruger Road upon completion of the project. PML's total financial donation toward the reconstruction of Kruger Road was to be $200,000. PML did not reconstruct the road, which the court found to be a material breach of the Agreement.

¶ 40     Third, the Agreement required PML to donate the property to the Village for the sum of one dollar at the completion of the grading project, but no later than

December 31, 2015. PML never conveyed the property to the Village. The donation of the property was to be by warranty deed free and clear of all liens and encumbrances. The court found that the payment of taxes was part of the requirement that PML convey the property to the Village by warranty deed free and clear of all liens, encumbrances, and SSA assessments as of the date of conveyance. However, it concluded that the failure to pay the real estate taxes when due was not a material violation of the Agreement because the Agreement required that all taxes be fully paid by the time of the conveyance, which provided PML with time to pay any delinquent taxes. Nevertheless, PML never redeemed the taxes and failed to convey the property to the Village by warranty deed by December 2015, which the court found to be a material breach of the Agreement.

¶ 41        Despite finding breaches by both parties, the court entered judgments in favor of PML on its breach of contract claims and the Village's breach of contract counterclaim because the Village materially breached the Agreement first. The court reasoned the Village could not seek to enforce the terms beneficial to the Village against PML given that the Village materially breached the Agreement first. Therefore, it held that PML's performance of its obligations under the Agreement was excused. The court awarded PML damages for lost revenue in the amount of $268,223.70 (based on the difference in target fill rate and the actual fill rate); additional costs relating to site preparation, topsoil, and clay work through the expiration of the grading permit in the amount of $4,898,161; and additional costs attributable to multiple revisions to PML's plans to comply with the Village's demands in the amount of $183,292. The court also awarded PML $1,571,795.60 in attorney fees and $2654.74 in costs.

¶ 42        The Village appealed, and PML cross-appealed. The Village raised four arguments. First, it argued that, because the circuit court found that PML had materially breached the parties' agreement, the circuit court should have awarded the Village judgment on its counterclaims. 2022 IL App (2d) 200779, ¶ 40. Specifically, the Village argued that the circuit court wrongly found that it had materially breached the Agreement and then compounded its error by finding that the Village's breach excused PML's obligations under the agreement. *Id.* Second, the Village argued that, because the court had found that PML materially breached the agreement, it erred in allowing PML to recover damages under the agreement. *Id.* Third, the Village argued that PML failed to satisfy its burden in proving

damages under the new-business rule. *Id.* Fourth, the Village argued that the circuit court erred in awarding attorney fees to PML. *Id.* In its cross-appeal, PML contended that its damages award should be increased. *Id.* ¶ 38.

¶ 43    As to the first issue, the appellate court found that the circuit court properly found "the Village materially breached the Agreement when it hindered PML's ability to use the property via customary means and methods." *Id.* ¶ 48. As one material breach is sufficient to prevent the Village from recovering under the Agreement, the court did not address the other ways the circuit court found that the Village had materially breached the Agreement. *Id.*

¶ 44    As to the second issue, the appellate court agreed with the Village that its breach of the agreement did not automatically alleviate PML of its contractual obligations. *Id.* ¶ 50. The court noted that PML chose to file a complaint and received a writ of *mandamus* to compel the Village to adhere to the terms of the Agreement. *Id.* ¶ 51. PML was able to complete its work on the property by December 2018. *Id.* Since PML elected to proceed with the Agreement after the Village's alleged breach of that Agreement, PML remained bound by the obligations imposed under the Agreement. *Id.* The appellate court found that the circuit court erred in finding that the Village's first breach excused PML from its obligations under the contract. Relying on *Chicago Washed Coal Co. v. Whitsett*, 278 Ill. 623 (1917), the appellate court concluded that neither party could recover damages since both parties materially breached the Agreement, and the court vacated the damages award in favor of PML. 2022 IL App (2d) 200779, ¶¶ 60-61. Given this finding, the appellate court did not address each party's challenges to the circuit court's damages calculation. *Id.* ¶ 62.

¶ 45                                    ANALYSIS

¶ 46    In this court, neither party challenges the circuit court's and appellate court's findings that each party materially breached the Agreement. Nor do the parties dispute the fact that the Village materially breached first. Instead, the arguments in this court are focused on the unique scenario presented in this case, where both parties materially breach a contract but there is a question as to whether each party elected to continue performing despite the breach. We are asked to determine each party's respective rights to pursue its breach of contract claims.

¶ 47    The appellate court found the Village could not recover since it breached the Agreement first. It also found that PML could not recover because it "elected" to continue the Agreement despite the Village's material breach. Given this "election," the appellate court found that PML remained bound to the terms of the Agreement. Since PML subsequently materially breached the Agreement, the appellate court found that it too could not recover damages. Upon review, we find that both parties elected to continue performing the Agreement. Therefore, we hold that both the Village and PML retained a viable claim for breach of contract.

¶ 48    Initially, PML contends that the appellate court erred in applying the election of remedies doctrine. Despite using the term "elected," what the appellate court applied is the partial breach doctrine. Although the partial breach doctrine has been referred to as an "aspect of [the] election of remedies," each doctrine has its own separate rules and distinct application. *Emerald Investments Ltd. Partnership v. Allmerica Financial Life Insurance & Annuity Co.*, 516 F.3d 612, 618 (7th Cir. 2008). The partial breach doctrine, which is at issue here, is an exception to the first-to-breach rule.[2] Both parties ask this court to adopt and apply the partial breach doctrine to this case, though they disagree on the result of the doctrine's application. We, therefore, focus our analysis on the application of the first-to-breach rule and the partial breach doctrine.

¶ 49                    A. The First-to-Breach Rule and Its Exception

¶ 50    Generally, to recover on a breach of contract claim, the party must have performed its part of the contract. See *Dubey v. Public Storage, Inc.*, 395 Ill. App. 3d 342, 361-62 (2009). This is true because substantial performance is a necessary element of a breach of contract claim. *Talbert v. Home Savings of America, F.A.*, 265 Ill. App. 3d 376, 379-80 (1994). The first-to-breach rule excuses a party's duty to perform under the contract if the other party materially breaches the agreement first. See *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 70 (2006); *Eager*

---

[2]PML contends that the appellate court should have deemed the Village's arguments on the partial breach doctrine "waived" because the Village failed to raise the issue in the trial court. However, PML failed to make this forfeiture argument in the appellate court. Therefore, PML has forfeited this argument. See Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***.").

*v. Berke*, 11 Ill. 2d 50, 54 (1957); *Finch v. Illinois Community College Board*, 315 Ill. App. 3d 831, 836 (2000). In other words, the first-to-breach rule excuses the injured party from future performance and allows the injured party to pursue its breach of contract claims. Conversely, the first breaching party cannot seek to enforce the contract against the injured party.

¶ 51   The circuit court in this case ended its analysis here. It found the Village breached first. This breach excused PML from performing, and only PML could recover. The circuit court's analysis was flawed. As the appellate court recognized, there is an exception to this rule where the nonbreaching party may lose its right to assert the first-to-breach rule if it accepts the benefits of the contract despite the other party's material breach. This is often referred to as the "partial" breach doctrine. See *Emerald Investments*, 516 F.3d at 618; *Dustman v. Advocate Aurora Health, Inc.*, 2021 IL App (4th) 210157, ¶ 38 (citing 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.15, at 437-38 (2d ed. 1998)). It applies where an injured party elects to continue performing under the contract despite the other party's material breach. By continuing the contract, the injured party remains bound by its obligation to perform. *Dustman*, 2021 IL App (4th) 210157, ¶ 38. This does not amount to a waiver of the right to damages for the first material breach, but the injured party may too be liable if it breaches the contract. See Restatement (Second) of Contracts § 237, cmt. e (1981).

¶ 52   All of this is to say that, following a material breach, the injured party reaches a fork in the road: it may either continue the contract (retain its benefits of the bargain and sue for damages) or repudiate the agreement (cease performing and sue for damages). See *id.* § 246, cmts. a-c, illus. 1-3; *Emerald Investments*, 516 F.3d at 618. If the party elects to continue with the contract, it cannot suspend performance later and then claim it had no duty to perform based on the first material breach. This election converts the material breach to a "partial" breach. "[T]he injured party may sue for any damages caused by the partial breach, but having elected to keep the contract in force, the injured party must continue to perform the contract on pain of likewise incurring liability for a breach." *Dustman*, 2021 IL App (4th) 210157, ¶ 38. Although this court has yet to explicitly adopt the partial breach doctrine, the general principle underlying the doctrine is well rooted in Illinois law. See *Chicago Washed Coal Co.*, 278 Ill. at 627-28; *Wollenberger v. Hoover*, 346 Ill. 511, 544-45 (1931) (discussing the concept in terms of inconsistent remedies); *Emerald*

*Investments*, 516 F.3d at 618 (applying Illinois law); *South Beloit Electric Co. v. Lar Gar Enterprises, Inc.*, 80 Ill. App. 2d 367, 374-75 (1967) (citing *Lichter v. Goss*, 232 F.2d 715 (7th Cir. 1956) (applying Illinois law)); *Dustman*, 2021 IL App (4th) 210157, ¶ 38. To the extent this court has not yet explicitly adopted the partial breach doctrine, we do so now.

¶ 53 The application of the partial breach doctrine is illustrated in *Dustman*, 2021 IL App (4th) 210157. In *Dustman*, a dispute arose between the plaintiff shareholders and two former shareholders, as well as the individuals that had purchased their shares. *Id.* ¶ 1. Initially, the plaintiffs alleged that it made several demands for the defendants to engage in arbitration or mediation as provided by the parties' operating agreement. *Id.* ¶ 36. The plaintiffs alleged that the defendants ignored or rejected those demands. *Id.* The plaintiffs brought an action against defendants raising several claims. *Id.* ¶ 16. The proceedings were initially stayed after the parties agreed to participate in nonbinding mediation. *Id.* ¶ 19. When mediation failed, the defendants filed a motion to stay the litigation and compel binding arbitration pursuant to the agreement. *Id.* ¶¶ 20-21. The plaintiffs, having changed their minds, argued that the defendants' initial refusal to mediate or arbitrate the dispute constituted a material breach. *Id.* ¶ 36. Thus, according to the plaintiffs, the plaintiffs were relieved of their contractual obligation to arbitrate the dispute expressed in their complaint. *Id.* ¶ 37.

¶ 54 The appellate court rejected the plaintiffs' argument. The court assumed that the defendants refused the demands for mediation or arbitration and that such refusal constituted a material breach of the operating agreement. *Id.* It noted, where there is a material, uncured breach of contract, the injured party must decide either to terminate the contract or continue the contract. *Id.* The court explained,

" 'If the injured party chooses to terminate the contract, it is said to treat the breach as total. The injured party's claim for damages for total breach takes the place of its remaining substantive rights under the contract. Damages are calculated on the assumption that neither party will render any further performance. They therefore compensate the injured party for the loss that it will suffer as a result of being deprived of the balance of the other party's performance, minus the amount of any saving that resulted from the injured party not having to render its own performance.

- 16 -

If the injured party does not terminate the contract, either because that party has no right to or does not choose to, the injured party is said to treat the breach as partial. The injured party has a claim for damages for partial breach, in addition to its remaining substantive rights under the contract. Damages are calculated on the assumption that both parties will continue to perform in spite of the breach. They therefore compensate the injured party only for the loss it suffered as the result of the delay or other defect in performance that constituted the breach, not for the loss of the balance of the return performance. Since the injured party is not relieved from performing, there is no saving to it to be subtracted.' " (Emphases omitted.) *Id.* ¶ 38 (quoting 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.15, at 437-38 (2d ed. 1998)).

¶ 55    The court continued by noting that, if the injured party elects to continue performing the contract by treating the breach as "partial," the injured party is bound by this decision and has lost the right to stop performance. *Id.* The court explained the effect of an election to proceed in these circumstances:

" 'Where there has been a material failure of performance by one party to a contract, so that a condition precedent to the duty of the other party's performance has not occurred, the latter party has the choice to continue to perform under the contract or to cease to perform, and conduct indicating an intention to continue the contract in effect will constitute a conclusive election, in effect waiving the right to assert that the breach discharged any obligation to perform. In other words, the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply where the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance.' " *Id.* ¶ 39 (quoting 14 Samuel Williston, Richard A. Lord, A Treatise on the Law of Contracts § 43:15, at 626 (4th ed. 2000)).

¶ 56    Applying the "partial" breach doctrine, the *Dustman* court found that, despite the defendants' previous refusals to submit to mediation or arbitration, the plaintiffs continued to insist that the defendants submit to mediation or arbitration under the operating agreement. *Id.* ¶ 40. The plaintiffs therefore insisted that the defaulting party continue to render future performance. *Id.* This constituted a conclusive

election to continue the contract. *Id.* Further, the parties underwent mediation of their present claims. *Id.* By participating in nonbinding arbitration, the plaintiffs performed their contractual obligations. *Id.* Therefore, the plaintiffs elected to continue the contract. *Id.* Because of this election, the appellate court concluded that the plaintiffs remained bound by the contractual duty to submit their dispute to arbitration. *Id.*

¶ 57    *Dustman* is helpful in establishing the general principle of the "partial" breach doctrine. That is, when a party to a contract elects to continue performing despite the other party's material breach, the nonbreaching party remains bound to its obligation to perform. It does not, however, answer the specific question presented in this appeal, that is: if an injured party elects to continue performing a contract—despite the other party's material breach—what is the consequence of the injured party's subsequent material breach? Or, in this case, what impact does PML's subsequent breach have on its ability to pursue its breach of contract claims against the Village? Similarly, what effect does PML's election to continue performing have on the Village's ability to pursue its breach of contract claim? Before answering those questions, we must first address each party's argument that it did not "elect" to continue performing the Agreement after the other party's material breach.

¶ 58    Neither party has provided a case establishing the standard of review for this specific question. Given that it is a disputed question of fact, we believe the decision to continue performing is a factual question to be reviewed under the manifest weight of the evidence standard. See generally *Galesburg Clinic Ass'n v. West*, 302 Ill. App. 3d 1016, 1019-20 (1999) (applying manifest weight of the evidence standard to similar issue of whether a party waived its right to assert a breach of contract claim); *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002) (generally, the standard of review in a bench trial is whether the order or judgment is against the manifest weight of the evidence); *cf. Dustman*, 2021 IL App (4th) 210157, ¶¶ 28-29 (applying *de novo* review to the same question presented here but where facts were not in dispute). We review the legal effect of that factual determination *de novo*. *Eychaner*, 202 Ill. 2d at 252 (applying *de novo* review to the circuit court's ruling on the legal effect of factual determinations).

¶ 59    Here, the circuit court found that "[e]ach party accused the other party of materially breaching the Development Agreement, but neither party stopped the development of the Property from proceeding even after PML filed its lawsuit against the Village in 2015." In other words, the circuit court found that PML and the Village elected to continue performing despite the other party's material breach. The record supports a finding that PML elected to continue performing. PML never sought to terminate the Agreement. It only asked to be relieved of its obligation to convey the property to the Village. When the Village refused to approve PML's grading permit, it could have terminated the contract. It did not. Instead, it insisted that the Village issue the proper grading permit. So too, when the Village interfered with PML's means and methods by dictating where and how to work on the property, PML could have terminated the Agreement. And, when the Village imposed terms not bargained for, PML could have terminated the agreement. Yet it continued to operate on the property, reaping significant economic benefits. We also do not view PML's actions as mere attempts to mitigate damages. PML sought and obtained *mandamus* orders extending its operations under the Agreement for several years in the future.

¶ 60    The Village asserts that it did not elect to continue the contract after PML's material breach. Therefore, it contends that the appellate court erred when it determined that it too could not recover under its breach of contract counterclaim. In the Village's view, its breach was converted to a partial breach, and it can show substantial performance to pursue its breach of contract claim. PML's material breach, on the other hand, never converted to a partial breach because the Village did not elect to continue performing. Since PML's breach remained material, it cannot show substantial performance. Therefore, the Village claims that it is entitled to judgment in its favor and PML is barred from recovering.

¶ 61    In holding that neither party could recover damages since both parties materially breached the Agreement, the appellate court relied on *Chicago Washed Coal*, 278 Ill. 623. However, the appellate court mischaracterized the holding of *Chicago Washed Coal*, as we will explain below. Additionally, the appellate court failed to consider the crucial factual distinctions between *Chicago Washed Coal* and this case.

¶ 62    In *Chicago Washed Coal*, the parties agreed to the sale and delivery of 1500 tons of certain types of coal to be delivered in daily installments from December 28, 1909, to March 30, 1910, with payment to be made on or before the tenth day of the month following shipment. *Id.* at 624. The seller could not supply the agreed-upon type of coal, or the entire amount agreed upon, but did deliver coal to the buyer. *Id.* at 624-25. The buyer refused to pay for any of the coal delivered in the month of March until the seller delivered more coal. *Id.* at 625. The seller gave notice to the buyer that it had rescinded the contract and would no longer deliver coal to the buyer based on the buyer's refusal to make payment. *Id.* The circuit court entered judgment in favor of the seller for the coal delivered that the buyer refused to pay for. *Id.* at 626. It denied judgment in favor of the buyer because it breached the agreement by refusing to make payments. *Id.* at 624. On appeal, this court held that the buyer's election to continue the contract meant that the buyer remained obligated to make payments. *Id.* at 627. The buyer's failure to make payments barred it from recovering damages caused by the sellers' breach of contract. *Id.*

¶ 63    In holding that neither party could recover in this case, the appellate court took the following statement from *Chicago Washed Coal* out of context: "Therefore the most that can be said for [the buyer's] case is that its proofs show that both parties were in default. In this condition of the record there could be no recovery by either against the other on the contract." *Id.* However, this court held that the seller properly recovered damages from the buyer's refusal to make payment for the coal delivered by the seller. *Id.* at 626. *Chicago Washed Coal* is consistent with the partial breach doctrine: the seller could recover despite its material breach because the buyer elected to continue the contract.

¶ 64    At this point, the facts of *Chicago Washed Coal* also diverge from the facts in the present case in a critical way. *Chicago Washed Coal* did not involve the question of whether both parties elected to continue performing despite the other party's material breach. Rather, the seller in that case affirmatively terminated the agreement. Consequently, we find the appellate court's analysis in our case flawed because it failed to consider whether the Village elected to continue performing despite PML's breach. If the answer to that question is "yes," then PML's material breach also converted to a partial breach.

¶ 65    Contrary to the Village's argument, the record supports the circuit court's finding that the Village also operated as if the Agreement remained in force despite allegations of breaches by PML. The Village acknowledges that its brief in the appellate court admitted "both parties elected to proceed," but it contends that this was merely a mistake. However, the Village's pleadings and arguments in the circuit court are consistent with the statement that the Village elected to continue performing. Throughout the proceedings, the Village claimed it performed its part of the Agreement and repeatedly sought specific performance. At the hearing on the Village's motion for partial summary judgment, the Village admitted that the parties would continue performing under the Agreement until at least 2018. At the time of that hearing, the Village already claimed that PML materially breached the Agreement. The Village could have made a claim to terminate the Agreement. It did not. In fact, the Village continued to demand specific performance of the conveyance of the property at trial. Even after trial, the Village maintained that it "demonstrated that it ha[d] allowed this project to go forward despite those numerous breaches." By presenting its claims as if the Agreement were still in force despite alleged breaches by PML, we cannot say the circuit court erred when it found that the Village also elected to continue performing despite PML's breach.

¶ 66    Having found both parties elected to continue the Agreement, we next determine whether either party may recover damages. As discussed above, by electing to continue performing the Agreement, both PML and the Village, in essence, treated each "material" breach as merely a "partial" one (or nonmaterial). See *All EMS, Inc. v. 7-Eleven, Inc.*, 181 Fed. App'x 551, 557-58 (7th Cir. 2006) (applying Illinois law). Unlike a material breach, when the breach is partial, " 'both parties may be guilty of breaches, each having a right to damages.' " *InsureOne Independent Insurance Agency, LLC v. Hallberg*, 2012 IL App (1st) 092385, ¶ 33 (quoting *Israel v. National Canada Corp.*, 276 Ill. App. 3d 454, 460 (1995)); see also *Devon Bank v. Schlinder*, 72 Ill. App. 3d 147, 154 (1979); *Dawdy v. Sample*, 178 Ill. App. 3d 118, 126 (1989) (holding that, where both parties mutually breach a contract, both parties are entitled to some, but not total, damages for breach). We hold that the Village materially breached first by failing to issue the proper grading permit, imposing obligations that were not part of the Agreement, and interfering with PML's means and methods. PML's election to continue the Agreement did not bar it from seeking damages, but it did convert the Village's material breach to a partial breach. Converting the breach to a partial breach meant that the Village

- 21 -

could seek a breach of contract claim if PML subsequently breached. PML subsequently materially breached by failing to convey the property, failing to fund the drawdown account, and failing to reconstruct Kruger Road. The Village could pursue its breach of contract claim based on those breaches given that the Village's breaches converted to partial breaches. The Village elected to continue the Agreement and converted PML's material breach to a partial breach. Therefore, PML's breaches did not bar it from pursuing a breach of contract claim against the Village for the Village's prior breaches. Each party had a viable breach of contract claim.

¶ 67  In sum, we find the appellate court erred when it held that neither party could recover damages. We hold that the circuit court correctly entered judgment in favor of PML on its breach of contract claim. However, it erred when it entered a judgment in favor of PML on the Village's breach of contract counterclaim. The circuit court should enter judgment in favor of the Village on its breach of contract counterclaim. The circuit court should calculate each party's respective damages and offset the ultimate award given.

¶ 68                          B. Unaddressed Issues in the Appellate Court

¶ 69  In the appellate court, both parties challenged the circuit court's calculation of PML's damages. PML argued that its damages should be increased, and the Village argued that PML failed to prove its damages. The appellate court did not reach these arguments, given that it held that neither party could recover. In addition, the Village challenged the circuit court's award of attorney fees. It appears the appellate court did not reach this issue. The Village and PML both request a remand to the appellate court to address these issues. We believe the most efficient approach is to remand the matter to the trial court. The trial court entered its judgment under the incorrect belief that the Village could not recover, and the court did not make findings as to the Village's damages. The trial court should enter a new judgment under the correct legal framework. It should also reconsider its award of attorney fees. Whether an additional evidentiary hearing on the Village's damages is required is for the trial court to determine.

¶ 70                                    CONCLUSION

¶ 71        For the foregoing reasons, we reverse the appellate court's judgment. We affirm circuit court's judgment in favor of PML on its breach of contract claims. We reverse the circuit court's judgment in favor of PML on the Village's breach of contract counterclaims. We remand the matter to the circuit court for further proceedings consistent with this opinion.

¶ 72        Appellate court judgment reversed.

¶ 73        Circuit court judgment affirmed in part and reversed in part.

¶ 74        Cause remanded.

¶ 75        JUSTICE ROCHFORD, specially concurring:

¶ 76        The facts relevant to the parties' remedies are straightforward: the Village and PML each materially breached the agreement, and each party, despite the mutual breaches, persisted in performing under the agreement. I agree with my colleagues that PML's election to continue the contract obligated PML to fulfill its obligations, thereby preserving the Village's claim for damages. Likewise, the Village's election to continue the contract obligated the Village to fulfill *its* obligations, thereby preserving PML's claim for damages. But on its journey to the correct result, the majority opinion veers off course, perpetuating the myth of the "partial breach." I write separately to clarify that the so-called "partial-breach" doctrine is better understood as an election of remedies.

¶ 77        If a party fails to perform his duties under a contract, without a valid excuse, he is liable for a breach of contract, and the remedy depends on whether the breach was material or minor. *Finch v. Illinois Community College Board*, 315 Ill. App. 3d 831, 836 (2000); *Circle Security Agency, Inc. v. Ross*, 107 Ill. App. 3d 195 (1982). The Seventh Circuit Court of Appeals, recognizing the difference, accurately described the "partial-breach" doctrine this way:

         "Like many legal doctrines, it is badly named. There is no such thing as a partial breach. There is a breach of contract, and there are alterations and terminations

                                        - 23 -

that are not breaches. The doctrine is really an aspect of election of remedies. If a party to a contract breaks it, the other party can abandon the contract (unless the breach is very minor [citations]) and sue for damages, or it can continue with the contract and sue for damages. [Citations.] But if it makes the latter election, it is bound to the obligations that the contract imposes on it. [Citations.] When [the defendant] *** broke its contract ***, [the plaintiff] could have terminated the contract. But it did not, and so [the defendant] was entitled to enforce the obligations that the contract put on [the plaintiff]." *Emerald Investments v. Allmerica Financial Life Insurance & Annuity Co.*, 516 F.3d 612, 618 (7th Cir. 2008).

¶ 78    Thus, a party injured by a minor breach is entitled to damages but may not abandon the contract. By contrast, a material breach allows the injured party to elect one of two remedies: (1) abandon the contract and sue for damages or (2) continue the contract and sue for damages but risk liability for failing to fulfill his own contractual obligations.

¶ 79    Contract breaches are described as material or minor, yet the majority repeatedly refers to "partial" breaches, which do not exist. The majority compounds the misnomer by holding that a material breach can "convert" to a "partial" breach. *Supra* ¶¶ 52, 60, 64, 66. A material breach remains material regardless of the chosen remedy—the breach is not diminished by the election to continue the contract. Rather, the material breach is *treated* like a minor breach.

¶ 80    A party who does not terminate the contract either because he has no right to (because the breach is minor) or elects not to (when the breach is material) has a claim for damages in addition to his remaining substantive rights under the contract. Damages are calculated on the assumption that both parties will continue to perform in spite of the breach. *Dustman v. Advocate Aurora Health, Inc.*, 2021 IL App (4th) 210157, ¶ 38 (citing 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.15, at 437-38 (2d ed. 1998)). To be sure, an injured party may sue for any damages caused by a material breach, but having elected to keep the contract in force, the injured party must continue to fulfill its obligations on pain of likewise incurring liability for a breach. *Id.*

¶ 81    I agree with my colleagues that PML and the Village, each having elected to keep the contract in force despite the mutual breaches, incurred liability for failing

to fulfill their respective contractual obligations. Therefore, I concur in the judgment.