2024 IL App (1st) 221813-U

Fourth Division
Filed September 26, 2024

No. 1-22-1813

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | |
|---|---|
| OG PLUMBING LLC, Plaintiff and Counterdefendant-Appellant and Cross-Appellee, <br><br> v. <br><br> BASECAMP OLD IRVING PARK LLC, MARIS TOLAN, LLC, LAKESIDE BANK N.A., PAUL TAPSCOTT, KARA TAPSCOTT, BASECAMP OLD IRVING PARK HOMEOWNERS ASSOCIATION, JONATHAN GALANTE, PATRICK GERDRON, CHRISTOPHER ALEXANDER, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC., LUCIANO PEDOTA, NANCY QUESADA, JENNIFER L. GASTER, JAY E. SZASZ, CHRISTOPHER PETERSON, SARA VOGL, JASON A. ELLIOT, TIMOTHY J. CARR, LAWRENCE KAMINSKY, YVONNE KAMINSKY, JASON P. NUTTELMAN, AMY JANE NUTTLEMAN, ZACHARY M. SAVAGE, ANNE M. SAVAGE, TODD BLAKE, MEGHAN BLAKE, STEVE MANOLIS, JULIE MANOLIS, RAPHAEL PEREZ, KARREN A. ARREDONDO, STEWART M. COERVER, MELISA J. COERVER, JOSIE XI ZHAO, PAUL DEHLIN, KIM LIANG TAN, JESSE SMITH, JULIE McDERMITT, JAMES TROY ALEX, DENISE MEYER, LILAH JONES, SOSTENES DIAZ, SUSAN DUBACK, CHRIS KLIMKIEWICZ, RENEE KLIMKIEWICZ, CHRISTOPHER KELLY III, JESSICA T. KELLY, WEST HOBBIE STREET REALTY, LLC, UNKNOWN OWNERS, and NON-RECORD CLAIMANTS, Defendants <br><br> (Basecamp Old Irving Park LLC and Maris Tolan, LLC, Defendants and Counterplaintiffs-Appellees and Cross-Appellants). | Appeal from the Circuit Court of Cook County <br><br> No. 2016 CH 12897 <br><br> The Honorable Anthony C. Kyriakopoulos, Judge, presiding. |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Rochford and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The trial court's finding that both parties breached the subcontract was affirmed over the parties' respective contentions of legal and factual error. The trial court's determination of damages was reversed insofar as it erroneously failed to account for what the owner would have paid the original subcontractor for defective work that had to be redone, requiring a remand for a redetermination of damages. In view of the remand, the trial court's denial of attorney fees was vacated.

¶ 2    This case arises out of a troubled residential-redevelopment project on the northwest side of Chicago. The owner, Basecamp Old Irving Park LLC (Basecamp), hired Maris Tolan, LLC, as the general contractor for the project. Maris Tolan, in turn, subcontracted the underground sewer and water work to Og Plumbing LLC (Og).[1] Og's work on the project did not go well, and it ultimately walked off the project over a payment dispute and recorded a mechanic's lien. It then sued Basecamp and Maris Tolan to foreclose on the lien, prompting Basecamp and Maris Tolan to countersue Og for breaching the subcontract. After a six-day bench trial, the court below found that both sides had breached the contract at different points, and it entered a judgment in favor of Basecamp based on the balance of the parties' respective damages.

¶ 3    Both sides appeal. As the appellant, Og argues (1) that Basecamp was not entitled to relief because it and Maris Tolan materially breached the subcontract through nonpayment and, in any event, failed to properly plead their counterclaim, (2) that the trial court's factual determination as to the cost Basecamp incurred to remove and replace an allegedly defective sewer pipe installed by Og was erroneous, and (3) that the trial court should have used a different method to calculate damages. As the cross-appellant, Basecamp argues (4) that Og was not entitled to a mechanic's lien because it did not substantially perform on the subcontract, (5) that the trial court erroneously found that Basecamp and Maris Tolan breached by failing to make progress payments even though they had valid contractual basis for not making payments, (6) that the trial court erroneously found that Og's breaches of the subcontract were not the cause of Basecamp's decision to fire Maris

---

[1]    At most points in the record, plaintiff's name is rendered as the initialism "OG." Its own invoices and its briefs on appeal, however, render its name as a word, either "Óg" or "Og."

Tolan as general contractor, and (7) that Basecamp was entitled to recover attorney fees as the prevailing party.

¶ 4     For the reasons that follow, we affirm the trial court's findings as to breach, but we reverse its damages determination and remand for recalculation, and we vacate the court's order denying fees without prejudice to either party's right to seek fees on remand.

¶ 5                              I.  BACKGROUND

¶ 6     The record in this case is extensive, so we relate only what is necessary to understand the context in which the issues on appeal arise, providing additional detail in our analysis as necessary.

¶ 7                              A.  Pleadings

¶ 8     Og initiated the underlying action in September 2016 by filing a complaint raising claims against Basecamp, Maris Tolan, and other parties with an interest in the properties associated with the development. Basecamp and Maris Tolan both counterclaimed against Og. In June 2017, as part of a separate settlement agreement, Maris Tolan assigned to Basecamp "all subcontractor agreements and all rights and liabilities thereunder, including the rights to pursue claims against subcontractors in [Maris Tolan's] name." Maris Tolan also agreed to defend Basecamp against Og's pending claims, at which point Maris Tolan's attorneys assumed the representation of Basecamp in this litigation. Basecamp then amended its countercomplaint to assert Maris Tolan's claims through the assignment.

¶ 9     Og's operative pleading was a four-count amended complaint filed in July 2018. In general, Og alleged that it had performed $573,976.51 of work on the project, including $361,976.51 in work that had not yet been paid for. It sought to recover that amount, plus applicable interest, under four legal theories: count I sought to foreclose Og's claimed mechanic's lien, count II was for breach of contract against Maris Tolan, count III asserted that Basecamp was jointly liable for the unpaid sum, and count IV sought to recover under a theory of unjust enrichment.

¶ 10    Basecamp raised three affirmative defenses to Og's complaint, including, as relevant to this appeal, that it was entitled to a setoff against Og's lien for the value of work not done "in full and

complete compliance with [the] contract plans and specifications, and in compliance with industry standards and in a good and workmanlike manner." Maris Tolan also raised setoff as an affirmative defense, alleging that it was entitled to an offset for the costs it incurred to repair and complete defective and deficient work performed by Og.

¶ 11    Basecamp's operative countercomplaint, filed in December 2019, raised four claims against Og. Basecamp asserted its own claims in count I (for breach of contract and implied indemnity) and count IV (for contractual indemnity). These counts alleged that Basecamp had sustained $164,253.90 in damages incurred to correct and complete Og's work on the project, a figure that was based on the difference between the subcontract price and the actual cost Basecamp incurred to complete the work that Og was supposed to do. Basecamp asserted Maris Tolan's claims in count II (for breach of contract and implied indemnity) and count III (for contractual indemnity). Those counts alleged that Og's various breaches had led Maris Tolan to incur $449,989.60 in damages, most of which arose from the loss of the general contractor's fee Maris Tolan would have been entitled to had Basecamp not fired it as a result of Og's deficient work.

¶ 12    Og raised several affirmative defenses to the counterclaims. As relevant here, Og asserted that Maris Tolan had waived strict compliance with various contractual provisions by, among other things, not notifying Og of alleged deficiencies in workmanship and not giving Og timely and adequate information about deadlines and changes in the scope of work. It also alleged that Maris Tolan had failed to mitigate its damages by not curing its own defaults under the general contract with Basecamp.

¶ 13                                         B.  Trial

¶ 14    A bench trial was held in November 2021. Five witnesses testified. Og's owner Maruice Connolly testified about Og's work on the project, his interactions with Maris Tolan and Basecamp, and his decision to walk off the project in June 2016. Maris Tolan partner Craig Tolan, who oversaw day-to-day operations for the project, also testified about those subjects. Both Tolan and Basecamp partner Zev Salomon testified about the transfer of Og's scope of work to a new

subcontractor (J.P. Hopkins) and Basecamp's decision to replace Maris Tolan as the general contractor. James Hopkins, the owner of J.P. Hopkins, testified about the work his company did on the project after Og's departure. Manuel Arzadon Jr., who was the city's mason inspector assigned to the project, testified about numerous occasions on which he determined that Og had improperly installed sections of sewer pipe and required the work to be redone. Arzadon's supervisor, Joseph LaVecchia, did not testify at trial, but his deposition testimony was admitted as an exhibit.

¶ 15    In summary, the evidence at trial showed that Basecamp acquired the site of a former football-helmet factory at 3700 North Milwaukee Avenue, on the northwest side of Chicago, with the objective of redeveloping it for residential use. The plans called for the construction of 48 new single-family homes with detached garages and the infrastructure necessary to support those homes, which included a new street, a new public alley, and utility services. In September 2015, Maris Tolan agreed to be the general contractor for the project. In December 2015, Maris Tolan entered into a subcontract with Og to install water and sewer main lines under the new street, connect those main lines to the individual homes, and perform a variety of related work.

¶ 16    According to the project schedule attached to both the general contract and the subcontract, Og's scope of work was to have begun in November 2015. Starting in December, Og was able to do some preparatory work at the site, but it was not able to begin any substantial work on the project until the necessary sewer and water permits were issued, which did not happen until late March. By that point, according to Salomon, the project was already behind schedule, and it fell even further behind due to "the lack of work that happened after that permit was issued." Og did not start working on the 24-inch sewer main until April 18. The reason for the month-long delay is not clear, but the record reflects that, during that time, Og performed other work at the project site, including the installation of a smaller sewer line that was to be connected to the main line.

¶ 17    What is clear is that, once Og commenced work on the main sewer line, it did not go well. Arzadon visited the site on a daily basis starting on April 18, and he repeatedly found problems, including misalignments, pipes being installed at the wrong grade or in the wrong place, and pipes

improperly set in the ground. More than once, Og violated the city's requirements by installing pipes without a surveyor present or during non-working hours, which meant that no inspectors were available. The city regularly required Og to redo its work to correct these issues. Things came to a head in early May, when Og workers ignored Arzadon's instructions to correct eleven sections of pipe that had been installed two feet away from the line they were supposed to be following. The city ordered a stop to the sewer work pending a meeting at city hall between representatives from Og, Maris Tolan, and the city. Although Og was permitted to resume work after the meeting, it did no further work on the sewer. Throughout the rest of May, it worked on other projects within the scope of its subcontract, including the installation of individual water services for several lots, installation of the new water main, and preparatory work for connecting the new water and sewer main lines to the existing main lines underneath Milwaukee Avenue.

¶ 18 Throughout Og's time on the project, Connolly clashed with Tolan. Subjects of dispute included whose responsibility it was to obtain permits and put together "submittals," Og performing work out of the order Maris Tolan wanted it to, Connolly's opinion that the project was uncoordinated and poorly run, and Tolan's frustration with what he saw as Connolly's unwillingness to cooperate. Connolly frequently threatened to quit the project—nearly every time he was on site, according to Tolan.

¶ 19 The most significant issue was Connolly's dissatisfaction with progress payments. As detailed later in this decision, the subcontract and the general contract set out a detailed scheme for subcontractors to request and receive monthly progress payments. It required requests to be submitted by the 25th day of the month, made using particular forms, and supported by specified documentation. It is uncontested that Og's payment requests took the form of bare invoices, without the necessary forms or documentation. Rather than rejecting Og's first two requests, Craig Tolan decided to rectify the problems himself by chasing down the right documentation and, apparently, preparing the correct forms. Og's first invoice, for $200,000, was sent in January 2016 and paid in February, minus 10% that was held as retainage per the subcontract. Its second invoice, for $12,000, was sent in March, but after that month's deadline, so it was not paid until May 10.

The $12,000 was paid in full, without any retainage; it is not clear why. Og's third invoice, which requested $10,000 for laying sewer pipe and $37,165.07 for materials purchases, was submitted on April 22. At trial, Tolan testified at one point that the invoice had been submitted and approved, but he later contradicted himself and testified that it had not been submitted because it did not comply with the subcontract's requirements for payment applications. Og's fourth and final invoice, submitted on May 13, requested payment of $312,000 "for (8) water services on lots 5-12 & work on water main & sewer," with no further breakdown provided. It also sought $2,811.44 for an overage on permits. As of late May, the third and fourth invoices had not yet been paid.

¶ 20    On May 31, Maris Tolan notified Basecamp that it was replacing several subcontractors and, in addition, bringing in more new subcontractors to take on a share of some existing subcontractors' work. One of the changes Maris Tolan anticipated making was having a new subcontractor, J.P. Hopkins, perform the work necessary to tie the new sewer and water mains into the city's existing mains under Milwaukee Avenue, which was within Og's scope of work. In a June 2 email to Basecamp partner Zev Salomon, Tolan wrote that Og was "preparing to do" that work and that J.P. Hopkins was still about a week away from securing its own permits. In the interest of completing the work as quickly as possible, Tolan recommended letting Og continue on its "current path" until it "fail[ed] to perform continually," at which point J.P. Hopkins would take over. To keep Og on the project, Tolan advised Basecamp to issue a check to pay Og for more than $42,000 "for work that is in place and not contested by us or the City." In a reply sent early the next morning, Salomon observed, "Obviously, we cannot overpay him a dime, and should really make sure whatever we are prepared to pay him is well below what h[e] might have already completed." Later that day, Basecamp made out a $20,000 check to Og directly, not through the title company, and Og kept working.

¶ 21    On June 8, Maris Tolan and J.P. Hopkins signed a subcontract for the sewer tie-in. Og continued working at the site through Friday, June 10. It did not return the following Monday. On Tuesday, June 14, it notified Basecamp and Maris Tolan through counsel that it intended to record a mechanic's lien. At the time Og walked off the project, its third and fourth invoices were still

outstanding. J.P. Hopkins took on Og's entire scope of work, which it completed on a time-and-materials basis.

¶ 22                               C. Findings and Judgment

¶ 23    After trial, the court entered a written memorandum and order stating its findings and announcing its judgment. The memorandum and order did not contain any express findings as to breach.

¶ 24    The trial court first found that Basecamp was not entitled to damages for Maris Tolan's lost general-contractor's fee because it had failed to prove that it had terminated Maris Tolan based on Og's breaches of the subcontract. The court identified Maris Tolan's inability to keep the project on schedule as the reason for Basecamp's decision to remove Maris Tolan as the general contractor, and it determined that Og was not responsible for those delays. It noted that the project was already behind schedule when Maris Tolan entered into the subcontract with Og and that there was evidence showing that the project was delayed by a variety of factors that Og was not responsible for such as the delays in the city's approval of the permits required for Og's work and the replacement of several other subcontractors by Maris Tolan, which the court construed as "evidence of widespread problems in the timely completion of the Project." It further noted that the subcontractor who replaced Og took more than four months to complete the work, well above the original estimate listed on the project schedule. The court acknowledged that Salomon had testified at trial that Maris Tolan was terminated based solely on the problems associated with Og, not with any of the other subcontractors. Because Salomon was a partner of Basecamp, though, the court noted that his testimony was self-serving and found it not credible in light of the evidence about other delays and difficulties not attributable to Og.

¶ 25    The trial court then turned to Og's claims, which it construed as being for the items billed in Og's unpaid third and fourth invoices. It found that Og was entitled to $37,165.07 for the materials billed in its third invoice and $2,811.44 for the permit overage billed in its fourth invoice. It also found that Og was entitled to $152,000 for installing water services for eight lots, which

made up part of the $312,000 charge on the fourth invoice for "work on water main and sewer." However, it found that Og was not entitled to a $10,000 charge for laying sewer pipe billed in the third invoice because that work did not meet city standards, so it had to be removed and redone by J.P. Hopkins. It also found that Og was not entitled to the remaining $160,000 billed in the fourth invoice for "work on water main and sewer" because the sewer work had to be demolished and replaced by J.P. Hopkins, because much of the water-main work was left undone when Og abandoned the project, and because Og had presented inconsistent testimony about the value of the work. In sum, the court determined that Og was entitled to compensation for $209,576.51 in work it had completed but not been paid for.

¶ 26    Finally, the trial court found that Basecamp was entitled to $335,087.81 from Og in "set-offs," which included $22,188 to replace city tree grates that Og had damaged, $1,500 to repair damage Og had caused to a foundation wall on one of the lots, $1,315.28 to replace a catch basin that Og improperly removed from the project site, and $310,084.53 to compensate Basecamp for paying J.P. Hopkins to remove and replace the main sewer line that Og had failed to properly install. The court found that Basecamp had not proven that it was entitled to compensation for additional costs it incurred for extended equipment rentals and that it was not entitled to compensation for the amounts paid to J.P. Hopkins to complete Og's unfinished work rather than to correct defective work.

¶ 27    Having found that Og was entitled to $209,576.51 and Basecamp to $335,087.81, the court entered judgment in favor of Basecamp for the difference, which was $125,511.30. It declined to award interest on that amount, explaining that it found no "basis in contract, statute, or equity" for doing so.

¶ 28    Og filed a timely motion to reconsider arguing that, because Basecamp and Maris Tolan materially breached the subcontract by failing to pay Og, they were not entitled to recover contractual damages from Og, which had legally abandoned the project based on Basecamp and Maris Tolan's breach. In the same motion, Og also sought clarification of "the legal basis" for the findings the court had entered in its memorandum and order. Specifically, Og asked the court to

clarify (1) whether Og "legally abandoned the project for nonpayment," (2) whether "Basecamp and/or Maris Tolan breach[ed] the subcontract by failing to pay OG in a timely manner," and (3) whether Og had "a valid and enforceable mechanic's lien." The court denied the motion to reconsider, but it clarified its findings in a written order.

¶ 29    The court's answer to the first two questions was straightforward. It noted that it had found that "OG was entitled to payment for work performed," that "nonpayment was the main reason why OG Plumbing breached [*sic*] the contract and walked off the job," and that "Basecamp and/or Maris Tolan refused to compensate OG and that directly led to OG abandoning the project for nonpayment." Noting that nonpayment can be viewed as a material breach, the court clarified that "OG legally abandoned the project for nonpayment" and that "Basecamp and/or Maris Tolan breached the subcontract by failing to pay OG."

¶ 30    Its answer to the third question was less clear. After reciting the elements of a mechanic's lien claim, the court explained that, because Og had walked away from the project due to nonpayment, it was "entitled to file a lien claim." But it noted that it had made two additional findings: first, that "OG Plumbing breached the contract because it did not substantially perform on the contract in a workmanlike manner and could not establish that its work was done in a workmanlike manner"; and second, that Basecamp had paid J.P. Hopkins $310,084.53 "for removal and replacement of an existing [24-inch sewer pipe] that suffered from misalignment, open joints, and incorrect elevations." It then quoted the following proposition from case law:

> " 'Where substantial performance of a contract in a workmanlike manner is established, a contractor is entitled to enforce his mechanic's lien for the amount attributed to the work furnished under the contract, subject to any deductions by way of setoff for *completing and correcting* the work.' *Mani Electrical Contractors* [*v. Kioutas*], 243 Ill. App. 3d 662, 668 (1993)." (Emphasis added by trial court.)

Based on this principle, the court concluded that Basecamp was "entitled to $310,084.53 as a set-off," which meant that Og was "not entitled to its lien claim."

¶ 31 Also after trial, Basecamp sought costs and attorney fees as the prevailing party under the fee-shifting provisions of the general contract and the subcontract. The court denied that request because it had "found that both parties breached the contract with both prevailing on some claims and failing on others."

¶ 32                                    II. ANALYSIS

¶ 33 The parties each present several issues for our review. For the sake of clarity, we will address them in the following order. First, we will consider Basecamp's arguments that neither it nor Maris Tolan breached the subcontract and that Og's own breaches defeated its claimed mechanic's lien. Next, we will consider Og's arguments concerning Basecamp's legal entitlement to damages and, if necessary, the proper measure of damages under the facts and circumstances of this case. After that, we will consider Basecamp's challenge to the trial court's determination that Og is not liable for Maris Tolan's lost general-contractor's fee. Finally, we will consider Basecamp's argument that it is entitled to attorney fees as the prevailing party.

¶ 34            A. Finding that Basecamp and Maris Tolan Breached the Subcontract

¶ 35 We begin with Basecamp's challenge to the trial court's finding that it and Maris Tolan breached the subcontract by failing to make required progress payments to Og. Basecamp argues that this finding was erroneous because they had a right to withhold payment under the subcontract because Og's work was defective, because Og failed to submit proper documentation when requesting payment, and because Og had caused property damage at the worksite.

¶ 36 Whether a party to a contract materially breached it presents a question of fact, so the trial court's finding is controlling on appeal unless it is against the manifest weight of the evidence. *LB Steel*, 2018 IL App (1st) 153501, ¶ 31. "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). Under that highly deferential standard, we do not substitute our own judgment for the trial

court's as to witness credibility, evidentiary weight, or the choice between competing inferences. *Best v. Best*, 223 Ill. 2d 342, 351 (2006).

¶ 37    The subcontract and the general contract set out a detailed scheme under which subcontractors, including Og, would receive monthly progress payments based on the percentage of the subcontractor's scope of work completed during that month, with 10% held back as retainage pending completion of the project as a whole. To obtain progress payments, a subcontractor was required to submit an "invoice package[ ]" containing various documentation, including an application for payment and a schedule of values prepared using certain specified forms, to Maris Tolan, which would then submit the package to Basecamp as part of its own monthly application for payment. Once the application was approved by Maris Tolan and Basecamp, the funds would be deposited in escrow with a title company, which would then pay the subcontractor directly. The contracts set specific deadlines for each step of this process: the subcontractor's invoice package was due by the 25th day of the month, Maris Tolan was required to submit the application to Basecamp by the first day of the following month, and payment was due no more than ten business days after Maris Tolan gave its approval. Late requests for payments would not be processed until the following month's payment cycle. "[R]eview and approval" of the payment request by Maris Tolan, Basecamp, and the title company responsible for making the payment was "a condition precedent" to any progress payment.

¶ 38    The evidence showed that Og submitted four requests for payment to Maris Tolan. Each one of those requests took the form of single-sheet invoices; there is no dispute that Og never put together the invoice packages or used the specific forms required by the subcontract. The first two invoices were paid in full. The fourth invoice was not paid, but payment would not have been due on it until sometime in June according to the payment schedule, and, on appeal, Og does not rely on nonpayment of the fourth invoice as justifying its departure from the project. That makes the third invoice, which was sent to Maris Tolan on April 22, 2016, the critical one.

¶ 39    Og's third invoice included three charges: $10,000 for "[l]aying sewer pipe," $6,713.07 for "[e]xtra pipe needed," and $30,452 for seven manholes and two catch basins. The materials charges

were for items not contemplated by the original subcontract, and Og had submitted a request to add them to the contract on April 18.[2] Craig Tolan specifically testified that this invoice was approved for payment:

"Q. Let's go to the next invoice. Invoice number 3, dated April 20th,

2016. Did you receive this invoice?

A. Yes.

* * *

Q. Was this invoice paid?

A. Yes.

Q. This invoice was paid?

A. Well, this invoice was submitted and approved.

Q. Okay.

A. Sorry.

Q. Okay. Do you know if it was paid?

A. I don't recall if it was paid."

Later, on cross-examination, Tolan contradicted himself and testified that he did not believe Og's third invoice had been submitted for payment because it lacked proper documentation and because, in addition to the new charges, it requested the payment of amounts that had been retained when paying previous invoices. Although the trial court would ultimately find that Og was not entitled to payment of the $10,000 charge for sewer work, Tolan sent an email to Zev Salomon on June 2, 2016, advising Basecamp to pay Og $42,448.56—the exact sum of the new charges on Og's third invoice minus the 10% retainage—"for work that is in place and not contested by us or the City" to keep Og working on the project.

---

[2] For reasons that are not clear from the record, the change orders were not approved until May 19. On appeal, Basecamp does not argue that Maris Tolan's delay in approving the requested changes made the invoice properly payable as part of the June draw.

¶ 40    Basecamp does not dispute that Og's third invoice was not paid, but it maintains that the nonpayment was not a breach. It relies on section 43.7 of the subcontract, which entitled Maris Tolan to "withhold payment" for several reasons, including "improper, erroneous or incomplete Payment Documentation; *** damage to the Subcontract work or any other work on the Site caused by the Subcontractor ***; *** or *** Defective Work not remedied." It argues that it and Maris Tolan was entitled to withhold payment because Og was performing shoddy work on the sewer, had failed to submit appropriate payment documentation, and had caused damage to other work being done at the site.

¶ 41    The problem with this argument is that Craig Tolan affirmatively testified that Og's third invoice was "submitted and approved." Although Tolan later contradicted himself, the trial court was entitled to resolve that contradiction in favor of Og. See *Visione v. Visione*, 93 Ill. App. 3d 920, 922 (1981) ("Evaluating contradicting evidence is the function of the trial court."). Under section 43.4 of the subcontract, the approval of a payment application was the last discretionary step in the process that triggered an obligation to pay. Tolan's June 2 email supports a conclusion that, at least at the time, Basecamp and Maris Tolan considered the charges on that invoice to be proper and payable. So does Salomon's telling response: "Obviously we cannot overpay him a dime, and should really make sure whatever we are prepared to pay him is well below what h[e] might have already completed." Even assuming that Basecamp or Maris Tolan could have withheld payment on the third invoice for one or more of the reasons it advances, the foregoing evidence allowed the trial court to reasonably determine that they chose instead to approve the invoice, making their failure to pay Og a material breach of the subcontract. See *B & C Electric, Inc. v. Pullman Bank & Trust Co.*, 96 Ill. App. 3d 321, 328-29 (1981) (holding that refusal to make a progress payment was a material breach). While a different trier of fact could have found differently, we cannot say that the court's determination was against the manifest weight of the evidence.

¶ 42                    B.  Og's Failure to Substantially Perform

¶ 43    The trial court found that Og breached the subcontract by failing to perform in a workmanlike manner, specifically by installing a defective sewer line that had to be removed and replaced by J.P. Hopkins. Basecamp contends that, as a matter of law, that finding should have disentitled Og to a mechanic's lien. From our reading of the clarification order, however, the trial court did not find otherwise; it determined that Og failed to substantially perform in a workmanlike manner and, accordingly, was "not entitled to its lien claim." Hence, the trial court did not err.[3]

¶ 44                              C.  Damages

¶ 45    We now turn to the issues raised by Og in its appeal. It argues that Basecamp was not entitled to "setoff damages" as a matter of law, that the trial court's finding as to the cost of repairing and replacing the sewer main line was against the manifest weight of the evidence, and that the trial court should have determined Basecamp's damages by computing the difference between the its actual cost to complete the original scope of Og's work and the subcontract price. The trial court's legal determinations are reviewed *de novo*. See *Thornton v. Garcini*, 237 Ill. 2d 100, 115-16 (2010). Its factual determinations with respect to damages, however, may be reversed only if they are against the manifest weight of the evidence. *Young v. Wilkinson*, 2022 IL App (4th) 220302, ¶ 84.

¶ 46                              1.  Setoff

¶ 47    Og contends that, as a matter of law, Basecamp was not entitled to "setoff damages" for two reasons. First, it argues that Basecamp failed to "plead a counterclaim based on setoff." Second, it argues that Basecamp and Maris Tolan's material breach of the subcontract through nonpayment excused Og from its duty to perform and disentitled Basecamp and Maris Tolan to

---

[3]  Although Basecamp does not argue that Og's failure to substantially perform in a workmanlike manner disentitled it to damages for breach of contract, we note that, under the partial-breach doctrine discussed later, Og was entitled to damages for breach of contract in spite of its poor work.

damages. Basecamp responds that it pleaded a breach-of-contract counterclaim and that, even if it breached the subcontract, it is still entitled to damages based on Og's earlier partial breaches.

¶ 48    We reject the borderline-frivolous argument that Basecamp is not entitled to damages because it did not specifically plead its contractual claims using the word "setoff." The Code of Civil Procedure expressly directs parties to designate any "claim *** in the nature of setoff" as "a counterclaim." 735 ILCS 5/2-608(a) (West 2022). Og admits, as it must, that Basecamp raised breach-of-contract and contractual indemnity claims in its countercomplaint. This is not a situation where the trial court awarded a setoff "absent a corresponding pleading." *Bartsch v. Gordon N. Plumbing, Inc.*, 138 Ill. App. 3d 188, 200 (1985). Nor was Og denied "an opportunity to defend or respond to such a claim." *Vieweg v. Friedman*, 173 Ill. App. 3d 471, 474 (1988). And, as Og acknowledges in its reply brief, the Code of Civil Procedure specifically provides for two judgments between the same parties to be set off against each other. 735 ILCS 5/12-176, 12-177 (West 2022); *LB Steel*, 2018 IL App (1st) 153501, ¶ 44. The court did not err by allowing Basecamp to file a counterclaim or by setting off Og's and Basecamp's respective damages.

¶ 49    We also reject Og's argument that Basecamp's and Maris Tolan's breach of the subcontract through nonpayment prevents Basecamp from recovering damages for Og's breaches. Og relies on the often-stated principle that "a party who materially breaches a contract cannot take advantage of the terms of a contract which benefit him, nor can he recover damages from the other party to the contract." *Dubey v. Public Storage, Inc.*, 395 Ill. App. 3d 342, 361-62 (2009). That rule governs straightforward cases when only one side breaches. Here, though, the trial court found that both parties breached at different points: Og breached by rendering unworkmanlike performance, and then Basecamp and Maris Tolan breached by not making progress payments.

¶ 50    The finding that both parties breached implicates the partial-breach doctrine. See *PML Development LLC v. Village of Hawthorn Woods*, 2023 IL 128770, ¶ 52 (confirming the doctrine's validity under Illinois law). The partial-breach doctrine flows from basic principles underlying contract law. Nonperformance of an obligation due under a contract is always a breach, and it always gives rise to a claim for damages. See Restatement (Second) of Contracts §§ 235, 236

(1981). But not all breaches are the same. Depending on its significance, a breach might be deemed material. The legal significance of a material breach is that it gives the nonbreaching party a justification to cease its own performance on the contract. See Restatement (Second) of Contracts § 237 (1981). In other words, a material breach presents the nonbreaching party with a choice. *PML Development*, 2023 IL 128770, ¶ 52. If it wishes, it can treat the breach as a total breach by repudiating the contract, ceasing performance, and suing for damages. *Id.* Alternatively, it can treat the breach as a partial breach by continuing the contract, thereby retaining its benefits, and suing for only those damages that arose from the partial breach. *Id.* If the nonbreaching party treats the breach as partial, then it continues to be bound by the contract, and it can be held liable for its own breaches in the future. *Id.* (citing *Dustman v. Advocate Aurora Health, Inc.*, 2021 IL App (4th) 210157, ¶ 38).

¶ 51     Here, the trial court found that Og breached by performing defective and deficient work. Rather than repudiating the subcontract, Basecamp and Maris Tolan treated Og's breach as a partial breach and chose to retain the benefits of the subcontract. That decision meant that Basecamp and Maris Tolan continued to be bound by the subcontract, as the trial court implicitly found when it determined that the later failure to make progress payments was a breach, but that did not waive their right to recover damages arising from Og's partial breaches. *Id.* ¶¶ 52, 66; *accord* Restatement (Second) of Contracts § 236(2) (1981). Under these circumstances, "[e]ach party had a viable breach of contract claim." *PML Development*, 2023 IL 128770, ¶ 66. The trial court therefore did not err when it found that Basecamp was entitled to damages for Og's partial breaches despite its and Maris Tolan's later material breach through nonpayment.

¶ 52                              2. Calculation of Basecamp's Damages

¶ 53     Og next argues that the trial court's calculation of Basecamp's damages was erroneous. Specifically, it contends that the court's finding that it cost Basecamp $310,084.53 to remove and replace the defective sewer main line was against the manifest weight of the evidence. Alternatively, it contends that the court erred as a matter of law by not determining Basecamp's

damages by computing the difference between the subcontract price and the actual total cost to Basecamp of completing the subcontract's scope of work.

¶ 54 The trial court's finding that Basecamp paid J.P. Hopkins $310,084.53 to remove and replace the defective sewer line was reasonable. James Hopkins specifically testified that the first change order to the J.P. Hopkins subcontract was for the removal and replacement of an existing sewer line made up of 24-inch reinforced concrete pipe due to misalignment, open joints, and improper grading. It is uncontested that the change order increased the value of the J.P. Hopkins subcontract by $310,084.53. The trial court credited and relied on Hopkins's testimony when calculating damages. On appeal, Og contends that the cost reflected in that change order is implausibly high, and it asserts that the testimony of city inspector Manuel Arzadon showed that only a limited amount of its work required correction. Even if we were to accept that interpretation, though, Arzadon's testimony would do no more than create a conflict with Hopkins's testimony about the cost and extent of the work necessary to remove and replace the sewer pipe. Resolving conflicts in the evidence is one of the basic roles of the trier of fact. *Young v. Wilkinson*, 2022 IL App (4th) 220302, ¶ 84. We are not persuaded that the trial court's reliance on Hopkins's assessment was unreasonable, arbitrary, or not based on the evidence.

¶ 55 That does not mean, however, that the trial court's ultimate damages determination was sound. Generally, "[t]he proper measure of damages for a breach of contract is the amount of money necessary to place the plaintiff in a position as if the contract had been performed." *In re Illinois Bell Telephone Link-Up II & Late Charge Litigation*, 2013 IL App (1st) 113349, ¶ 19; *accord* Restatement (Second) of Contracts § 347, cmt. a (1981). Damages should not provide a windfall by placing the plaintiff in a better position than that. *In re Illinois Bell*, 2013 IL App (1st) 113349, ¶ 19.

¶ 56 The parties agree that, had Og breached the subcontract by unjustifiably quitting the project, Basecamp's damages would have been measured by calculating the additional cost it incurred to finish the job; *i.e.*, the difference between what it would have paid Og under the subcontract and what it ultimately paid J.P. Hopkins to complete Og's scope of work. As explained

earlier, though, Og's departure was not a breach because it was justified by Basecamp and Maris Tolan's failure to make progress payments. See *PML Development LLC*, 2023 IL 128770, ¶ 52 (noting that a party may respond to a material breach by repudiating the contract, ceasing performance, and suing for damages). So, Basecamp is not entitled to be put in the same position it would have been had Og fully performed. Rather, it is only entitled to " 'any damages caused by the partial breach.' " *Id.* (quoting *Dustman*, 2021 IL App (4th) 210157, ¶ 38).

¶ 57    The question, then, is the extent to which Basecamp was damaged by the fact that Og installed a defective sewer line—work that Og rightly did not receive payment for. Using the methodology the parties agree would be proper, Basecamp's damages can be measured by determining the difference between what Basecamp would have paid Og under the subcontract for that work and what it actually paid J.P. Hopkins to remove the defective pipe and install a proper one. The trial court determined that Basecamp's actual cost was $310,084.53, but it did not determine and subtract the amount Basecamp would have paid Og to do the work properly in the first place. The result is a windfall to Basecamp: it gets a properly installed sewer line but pays nothing for it, not even what it would have paid Og, while Og—which should only have to pay for the extra costs associated with having J.P. Hopkins get the job done on a time-and-materials basis—winds up paying the entire cost.  Because the trial court failed to determine what Og would have been paid, its damages assessment was legally erroneous. We reverse the damages award and remand for the trial court to determine, in the first instance, what Basecamp would have paid Og for the sewer line under the subcontract and then recalculate damages accordingly. We note that, in light of the trial court's determination that Og was not entitled to its claimed lien, Og will not be entitled to statutory interest should its breach-of-contract damages exceed Basecamp's.

¶ 58                              D.  Maris Tolan's Lost Fee

¶ 59    Next, Basecamp challenges the trial court's finding that Og was not liable for the loss of Maris Tolan's contractor's fee. At trial, Zev Salomon testified that Basecamp fired Maris Tolan as the general contractor solely because of the "catastrophic" delays purportedly caused by Og's

inability to install the main sewer line properly. The trial court specifically rejected that testimony because there was evidence of widespread problems on the project and because Basecamp, which had acquired Maris Tolan's claim against Og, stood to gain from a finding that Og's breaches of the subcontract caused Maris Tolan to lose its general contractor's fee. The reason why Basecamp fired Maris Tolan is a question of fact, so our task on review is not to retry the issue ourselves but to "determine whether the circuit court's finding is supported by the evidence" presented at trial. *Wells v. State Farm Fire & Casualty Insurance Co.*, 2021 IL App (5th) 190460, ¶ 38. Because the judge, sitting as the trier of fact, was in a better position to observe Salomon's testimony, evaluate its credibility, and decide what weight to give it, we must affirm unless the finding was against the manifest weight of the evidence. *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437, ¶ 23.

¶ 60    The record substantiates the trial court's finding that Og's breaches of the subcontract did not cause Maris Tolan to breach the general contract. According to the project schedule that was attached to both the general contract and Og's subcontract, work on the sewer was supposed to start on November 11, 2015. It is undisputed that Og was unable to perform that work because the necessary permits were not issued until March 23, 2016—a delay of more than four months that Solomon testified was not Og's fault. The record does not appear to include any evidence showing that Og was responsible for the additional delay between the permits being issued and Og commencing work on the main sewer line on April 18. A reasonable interpretation of the evidence, moreover, is that the five-month delay made it impossible for Maris Tolan to meet Basecamp's deadlines. Based on the project schedule, the sewer and water utility work was expected to take 30 workdays from start to finish: 20 days for the sewer and 15 days for the water main, with 5 days of overlap.[4] Based on the start date of April 18, 2016, that combined work would not be expected to be complete until May 27. Per the closing schedule, which set out the dates for substantial completion under the general contract, Maris Tolan was obligated to have the first house ready to

---

[4]    Per the project schedule, "Sanitary" work was to commence on November 11 and end on December 8, 2015, which would be 20 weekdays, including Thanksgiving Day. "Watermain" work was scheduled to start on December 2 and run through December 22.

close on April 15 and one additional house ready to close every seven days thereafter. May 27 was the same day that the seventh house was supposed to be ready for closing. But there was more than water and sewer work to do, of course. The other utilities work at the site, including gas, electricity, and telecommunications, was expected to take 12 workdays, meaning that it would not be complete until June 15, by which point Maris Tolan would be past the completion date on a total of nine houses. Even then, there would still be roads and alleys to pave, sidewalks to lay, and other surface work to do, and each week that went by represented one more house that Maris Tolan failed to complete on schedule. The project, in short, was already well behind schedule by the time Og started working on the sewer.

¶ 61    The evidence also showed that the project was beset by other problems. On May 31, Maris Tolan notified Basecamp by email that it intended to make significant changes to the subcontractors responsible for siding, ceramic tile, roofing, electrical, and carpentry. Salomon testified at trial that some of these changes were made due to "unacceptable" work by the original subcontractors. Maris Tolan's email reflects that, as of May 31, work was still being done on lots 1 through 5, which were supposed to have been ready between April 15 and May 13. Salomon testified that the first houses were not "completed and ready to be closed" until June 2016, well behind schedule. It is reasonable to infer from this that, even if Og had completed its work by the end of May, Basecamp still would have had ample cause for firing Maris Tolan.

¶ 62    Further, the record substantiates the trial court's finding that Salomon's testimony on this point was self-serving. Before trial, Maris Tolan assigned its rights and liabilities under the subcontract to Basecamp. It follows that Salomon, who was a partner in Basecamp, was not an unbiased and independent witness. He had a strong financial interest in convincing the court to find that Og was responsible for the decision he made with his partners to fire Maris Tolan from the project. That interest, of course, bore on his credibility. See *Myers v. Heritage Enterprises, Inc.*, 354 Ill. App. 3d 241, 250 (2004) ("It is generally accepted that inquiry may be made to a witness's interest in the lawsuit because it is relevant to the witness's credibility.").

¶ 63    Between the evidence that the project was fatally behind schedule through no fault of Og and Salomon's obvious interest in laying the blame for the project delays entirely at Og's feet, the trial court's decision to reject Salomon's testimony on this point was not unreasonable, arbitrary, or not based on the evidence, and this is not a case where the opposite conclusion was readily apparent. Accordingly, the trial court's finding that Og's breaches did not cause Maris Tolan to lose its contractor's fee was not against the manifest weight of the evidence.

¶ 64                                  E.  Attorney Fees

¶ 65    Finally, Basecamp argues that the trial court erred when it denied its posttrial petition for attorney fees. Under the terms of the general contract, which were incorporated by reference into the subcontract, in any lawsuit on the contract, the "prevailing party" would also be entitled to recover attorney fees. Basecamp contends that, because the trial court's ultimate judgment was in its favor, it was unquestionably the prevailing party in the litigation. The trial court disagreed, finding that, because "both parties breached the contract with both prevailing on some claims and failing on others," neither party was the prevailing party, so Basecamp was not entitled to recover fees despite the balance of the judgment falling in its favor. We review that determination for an abuse of discretion. *1002 E. 87th Street LLC v. Midway Broadcasting Corp.*, 2018 IL App (1st) 171691, ¶ 30. A trial court abuses its discretion when its decision is arbitrary, fanciful, unreasonable, or based on a view that no reasonable person would take. *Haage v. Zavala*, 2021 IL 125918, ¶ 40. In other words, the decision must be "clearly against logic." *State Farm Fire & Casualty Co. v. Leverton*, 314 Ill. App. 3d 1080, 1083 (2000).

¶ 66    "A prevailing party, for purposes of awarding attorney fees, is one that is successful on a significant issue and achieves some benefit in bringing suit." *J.B. Esker & Sons, Inc. v. Cle-Pa's Partnership*, 325 Ill. App. 3d 276, 280 (2001). Further, "a litigant does not have succeed on all its claims to be considered a prevailing party." *Peleton, Inc. v. McGivern's Inc.*, 375 Ill. App. 3d 222, 227 (2007). "However, when the dispute involves multiple claims and both parties have won and lost on different claims, it may be inappropriate to find that either party is the prevailing party and

an award of attorney fees to either is inappropriate." *Powers v. Rockford Stop-N-Go, Inc.*, 326 Ill. App. 3d 511, 515 (2001). A court should evaluate which party prevailed, if any, "by examining the various claims and the trial court's rulings." *Id.* at 516.

¶ 67 Here, Og lost on mechanic's-lien claim but prevailed on its breach-of-contract claim. Basecamp prevailed on its own breach-of-contract claim but lost on Maris Tolan's breach-of-contract claim. As the trial court accurately noted when it denied Basecamp's fees petition, it "found that both parties breached the contract with both prevailing on some claims and failing on others." Basecamp emphasizes that, on balance, the judgment was ultimately in its favor, but that means only that the value of its successful claim exceeded the value of Og's successful claim. The relative value of claims can be a relevant consideration. See *Powers*, 326 Ill. App. 3d at 513, 517-18 (holding that trial court abused its discretion by awarding fees to plaintiff who won $875 judgment on one count but lost on its primary claim, which sought damages of more than $50,000). But this is not a case where the value of one party's successful claim was orders of magnitude less than the other's. *Cf. J.B. Esker & Sons*, 325 Ill. App. 3d at 278, 282 (holding that defendant who won award of $26,145 was entitled to recover attorney fees as the prevailing party from plaintiff who won award of $938).

¶ 68 Nevertheless, we need not decide at this juncture whether the trial court's determination that neither Og nor Basecamp was a prevailing party was an abuse of discretion. As we are remanding for a redetermination of Basecamp's damages, the precise balance is likely to change, and any determination of which party, if any, can be deemed to have prevailed would be premature. Accordingly, we vacate the order denying Basecamp's fees petition without prejudice to either party's right to seek attorney fees on remand.

¶ 69                                      CONCLUSION

¶ 70 For the foregoing reasons, we find no error in the trial court's determinations of liability on the parties' respective claims, but we hold that its calculation of damages was against the manifest weight of the evidence because it failed to take account of what Basecamp and Maris Tolan would

have paid Og under the subcontract to install the sanitary sewer main. We therefore reverse the trial court's determination of damages and remand for the trial court to recalculate damages in a manner consistent with this decision. Because that renders the question of whether either party can be considered to have prevailed premature, we also vacate the trial court's order denying Basecamp's request for attorney fees. Otherwise, we affirm.

¶ 71    Affirmed in part, reversed in part, and vacated in part.

¶ 72    Cause remanded with directions.