NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 250497-U

NO. 4-25-0497

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 3, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ANCHOR PROPERTIES, LLC, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| THE CITY OF ROCK ISLAND, | ) | No. 21CH74 |
| Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | Richard A. Zimmer, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices DeArmond and Vancil concurred in the judgment.

**ORDER**

¶ 1     *Held*: The appellate court affirmed the trial court's judgment in favor of defendant in a
             breach of contract action where plaintiff materially breached the contract first.

¶ 2     Plaintiff, Anchor Properties, LLC (Anchor), filed a breach of contract action against

defendant, the City of Rock Island (City). Following a bench trial, the trial court ruled in favor of

the City. Anchor appeals, contending that the court erred in finding that Anchor breached its

agreement with the City and was therefore not entitled to specific performance or money damages

from the City. For the following reasons, we affirm.

¶ 3                             I. BACKGROUND

¶ 4     On September 1, 2021, Anchor filed a complaint against the City asserting that the

City breached its contract with Anchor concerning a sewer line running underneath Anchor's

property. Anchor alleged that the parties contracted on August 14, 2019, to protect both the City's

sewer line and Anchor's parking lot, located on top of the sewer line. Anchor further alleged that the expansion and contraction of the sewer line due to temperature variances damaged Anchor's concrete parking lot. Anchor demanded either a decree of specific performance requiring the City to move the sewer line or money damages to repair the concrete.

¶ 5    The case proceeded to a bench trial on January 27, 2025. The following evidence was presented.

¶ 6    Michael Edmunds, a co-owner of Anchor, testified that Anchor began construction on its property in June 2019. At the beginning of the project, Anchor removed two and a half to three feet of soil over the whole site. Anchor became aware of a sewer main running under the property on July 10, 2019, after the foundation and flooring for the building had been poured. At that time, the main was "at subgrade level," meaning that it was essentially even with the top of the soil.

¶ 7    In July 2019, Anchor reached out to Alan Fries, who was "a member of [the City's] community in economic development division." Edmunds raised concerns about "freezing of the pipe as it will not be below the frost line" and "[h]eaving and shifting of the ground and potentially shearing of the pipe." He asked Fries, "[I]f the pipe does freeze, break, or something else happens that would cause the concrete in the parking lot needing to be torn out, who is responsible for the replacement cost of that concrete?" He also asked whether the pipe should be rerouted. Edmunds testified that he even "offered to do a cost share at some point in this at 50/50 with the City." However, the City refused to move the sewer main because doing so would be very expensive ($100,000 in 2025, or about $70,000 in 2019).

¶ 8    Fries forwarded Edmunds's e-mail to Michael Kane, who was an assistant city engineer at the time. Kane testified that they discussed "the depth of [the sewer line] in regards to

possible freezing of the sewer main." In an e-mail following a phone conversation between Kane and Edmunds, Kane stated:

> "If in the future it is necessary to repair the main, the City will conduct the necessary repairs and will also repair any damage to existing driveway and parking lot pavements necessitated by the sewer repairs.
>
> If possible, it would be beneficial to raise grades in this section of the parking lot at least another foot or so for protection of the pipe. However, the pipe in this main is rated high enough to carry the proposed traffic loads. In addition, the placement of fiber board insulation over the pipe trench would also provide an additional layer of protection for the pipe."

Kane clarified that by "traffic loads," he meant that vehicles crossing the pavement would not break the pipe and by "protection for the pipe," he meant to protect the pipe from freezing. He testified that additional grading and insulation would protect the pipe from freezing and prevent temperature differentials between the pipe and the surrounding ground.

¶ 9    Following Kane's e-mail to Edmunds, Anchor's attorney drafted an "Agreement Regarding Sewer Line" (Agreement). Edmunds e-mailed the proposed Agreement to Kane on August 2, 2019, and asked Kane whether he was authorized to sign on the City's behalf. Kane testified that he gave the proposed Agreement to his supervisor, Larry Cook, who was the City's Public Works Department director. Cook eventually told Kane to "go ahead and sign it." Kane signed the Agreement and sent it back to Edmunds on August 14, 2019.

¶ 10    In relevant part, this Agreement states:

> "WHEREAS, the parties intend to hereby set forth their understanding and agreement regarding maintenance and service of the sewer line.

2. The City believes cleaning services are not necessary for the subject sewer line, as the grey matter in the pipe moves with sufficient velocity it will cause the pipe to remain clear of debris. Nonetheless, in the future, should the subject sewer line or main require repair, the City will conduct the necessary repairs, at its cost. Further, the City shall repair, at its cost, any damage to Anchor's driveway and parking lot pavement necessitated by (a) any such sewer repairs, (b) rupture of the sewer line as a result of freezing or (c) any other occurrence related to the sewer line or main, not caused by Anchor's gross negligence or intentional act.

3. To the best of its ability, in accordance with its plans to construct a building at the Anchor Property, as determined by [Anchor] in its discretion, it will raise the grade in the area surrounding the sewer line, and place fibre [*sic*] board insulation over the pipe trench."

¶ 11    Kane explained that it was his understanding that Edmunds was concerned about "who would be responsible for restoration of the parking *** lot, should any work have to be performed on the sewer main." He stated that sewer mains typically do not freeze and burst only infrequently, but if that were to occur and a pipe required repairs, the City would sometimes have to access private property to conduct those repairs. Kane testified that it was the City's regular practice to pay the cost to replace any concrete that they had to disrupt to access a pipe. He acknowledged that he had not previously signed a contract on the City's behalf.

¶ 12    Edmunds testified that he then "had conversations and discussions" with his general contractor and subcontractors "in regard to the feasibility" of adding insulation and raising the grade around the pipe. They "determined it wasn't feasible to do that without any major revisions

to the site plans and the whole project together," especially given their "limited budget." At that point in August 2019, the foundation, floor, and plumbing under the floor had been completed, but the construction on the building and parking lot had not yet begun. Edmunds stated that raising the parking lot by a foot and a half without raising the foundation would present a problem for "handicapped accessibility." He explained that they considered raising the foundation but ultimately decided not to because of budgetary concerns and the concern that such measures would not have fixed the problem. According to Edmunds, even if they had raised the grade by a foot and a half, the pipe would still be above the frost line, and thus the temperature differential that caused the concrete to heave would still have been present.

¶ 13        Bjarne Sorensen Jr., the owner of Goetz Concrete Construction Corp., subcontracted with Anchor's general contractor to perform the concrete work at the Anchor property. He testified that they poured the footings, foundation, and floor of the building in July 2019, before the sewer pipe was discovered. He explained that the grade was not raised nor was insulation added over the sewer pipe prior to pouring the concrete for the parking lot. He stated that in October or November 2019,

> "[T]hat option was proposed to us and based on the grades that were designed, and our—our expertise, we looked at that option, and decided it wasn't feasible because *** the conditions of the building and the site and the elevations we had to work with, *** we could not raise the paving and still have the concrete perform as it should with fall to drain, so that was not an option."

He explained that had the grade been raised by about a foot and a half, the parking lot would have been above the finished floor of the building, which meant that the "overhead door would not have been able to be utilized" and "water would have been directed towards the building."

¶ 14     Sorensen acknowledged that they could always raise the foundation, but it would be costly, as they would have had to potentially remove the flooring and tear down any framing that had already been built. He could not remember if he and Anchor had discussed the option of raising the foundation. He testified that had they raised the foundation, the parking lot would need to be redesigned to comply with the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 *et seq.* (2018)) and an earthwork contractor would have to regrade the site.

¶ 15     In contrast, Kane testified that it would have been possible for Anchor to raise the grade of the parking lot after the foundation was poured by bringing in additional soil. He acknowledged this would have put the parking lot above the entrance to the building, but they could have fixed this by building a retaining wall. He also believed that Anchor "should have located the sewer main and its depth before they went out for any kinds of bids or anything during the design process."

¶ 16     Edmunds explained that in making the ultimate determination not to add insulation or raise the grade of the parking lot, he (1) "relied on the agreement" with the City that "[i]f there are issues with this, the City will take responsibility," (2) considered that "implementing the [City's] suggestions *** would still keep this pipe above the frost line which would still cause the heaving and shifting of the pipe," and (3) considered "[t]he fact that we tried to get the City to relocate the pipe at a cost share and they refused to do that." He stated that had Kane not signed the Agreement, Anchor would have stopped construction. He testified that he did not notify the City that Anchor would not be raising the grade or insulating the pipe because of the language in the Agreement granting Anchor discretion to do these tasks to the best of its ability.

¶ 17     The parking lot was poured in November and December 2019. In January 2021, Edmunds reached out to Kane to inform him that the concrete parking lot had cracked along the

sewer line. Kane testified that he believed the concrete cracked because of a "temperature differential" between the sewer pipe and the surrounding ground "which allowed frost into the surrounding subgrades" and caused the concrete to heave. He explained that "there was a prolonged very cold snap" that winter. He believed that the concrete would not have cracked had Anchor added insulation and raised the grade above the pipe. However, he acknowledged that even if Anchor had raised the grade by approximately a foot, the sewer pipe would still be above the frost line, where the ground is subject to freezing. He noted that water pipes are not always below the frost line, either. Kane clarified that the sewer pipe itself had not frozen or needed any repairs since 2019.

¶ 18　　　　The trial court announced its ruling on February 14, 2025. The court found that "[t]he type of repair that is being sought here *** is included in the contract." However, the court declined to enter a decree of specific performance requiring the City to move the sewer line, as "[t]hat's not in the contract."

¶ 19　　　　The trial court explained:

"2(a) and 2(b) in the contract, to me, cover damage and repairs necessitated by the failure of the sewer line. If only repairs contemplated by a failure of the sewer line [were] included in the contract, I'm not really sure why we would have paragraph 2(c). That seems to take it beyond just that.

Negligence. I don't find that the *** plaintiff did anything negligent that would defeat the claim."

The court then considered whether Anchor materially breached the contract by failing to raise the grade in the area surrounding the sewer line and place fiberboard insulation over the pipe trench. The court highlighted Edmunds's testimony that he would have taken different steps and perhaps

even stopped construction had Kane not signed the Agreement. The court explained that it could not find any cases defining the phrase " 'to the best of one's ability,' " and thus did a Google search. The court stated,

"So when I did a Google search, I got an AI answer, and the AI overview was 'In a contract, the phrase, quote, to the best of its ability, close quote, means that a party is obligated to perform a task or fulfill their obligations with the utmost effort and diligence, given the circumstances and limitations they face, essentially signifying that they will try their hardest to achieve the desired outcome but are not guaranteeing perfect results.'

And that was in my mind what I felt that sort of language meant, although I couldn't find a case that found that ***. ***

I don't think [Edmunds], in his mind, had any intention of doing anything. I think it's clear he was relying on the agreement. I've got this agreement here; I can just have them come fix it. And I just can't find that he did—in the record, anything that he did after the agreement.

And it kind of goes back to what I said about the first and third topics we discussed. I think his understanding of the agreement was he had no obligation, and he did absolutely nothing. I think he basically viewed this agreement as an insurance policy to protect himself, and it's not.

***

There's nothing in the agreement that references any cost to him nor gives him an unilateral right to decide what is too much, and the agreement also says,

when you read that paragraph, 'will.' And I think you've got to look at that 'will' when you read it all as one.

I think he had to do something. It might not have been perfect, but I don't think he did anything, and certainly not to the best of his ability. 'In his discretion' means how he does it to the best of his ability, not whether or not he can decide to do nothing."

¶ 20    On March 7, 2025, Anchor filed a motion to reconsider. At a hearing on April 22, 2025, the trial court denied the motion.

¶ 21    This appeal followed.

¶ 22                                        II. ANALYSIS

¶ 23    On appeal, Anchor argues that the trial court erred by finding that (1) paragraph 3 of the Agreement was ambiguous, (2) the Agreement required Anchor to raise the grade and add insulation around the sewer pipe, and (3) Anchor's failure to do so materially breached paragraph 3, thus depriving Anchor of its right to enforce paragraph 2(c) against the City. In opposition, the City contends that the court correctly found the Agreement was ambiguous and that Anchor materially breached the Agreement. The City adds that although the court never explicitly ruled on this issue, the contract was also void and unenforceable because there was no "meeting of the minds," as the parties understood the Agreement to mean different things.

¶ 24    "In construing a contract, the primary objective is to give effect to the intention of the parties." *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). We "first look to the language of the contract itself to determine the parties' intent." *Thompson*, 241 Ill. 2d at 441. When "the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Thompson*, 241 Ill. 2d at 441. "However, if the language of the contract is susceptible

to more than one meaning, it is ambiguous," and "a court can consider extrinsic evidence to determine the parties' intent." *Thompson*, 241 Ill. 2d at 441. A contract is ambiguous when written terms "are reasonably susceptible to more than one meaning," not "merely because the parties disagree on its meaning." *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 153 (2004). An ambiguous contract "will be strictly construed against the drafter." *Central Illinois Light*, 213 Ill. 2d at 153.

¶ 25        When determining whether a contract is ambiguous, rather than "viewing a clause or provision in isolation, or in looking at detached portions of the contract," we must construe the contract "as a whole, viewing each provision in light of the other provisions." *Thompson*, 241 Ill. 2d at 441. Critically, "[a] court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used." *Thompson*, 241 Ill. 2d at 442.

¶ 26        Whether a contract is ambiguous is a question of law subject to *de novo* review. *K's Merchandise Mart, Inc. v. Northgate Limited Partnership*, 359 Ill. App. 3d 1137, 1142 (2005). If, however, the contract is ambiguous and "extrinsic evidence is needed to establish the intent of the parties, that intent is a question of fact and will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence." *K's Merchandise Mart*, 359 Ill. App. 3d at 1142. A finding is against the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on the evidence." *Wells v. State Farm Fire & Casualty Insurance Co.*, 2021 IL App (5th) 190460, ¶ 38.

¶ 27                                A. Paragraph 2(c)

¶ 28        The first question is whether the Agreement contemplated that the City would repair the concrete at its cost when the temperature differential between the sewer pipe and the

surrounding ground caused the ground to heave and crack the concrete. Though Anchor does not challenge the trial court's ruling in its favor on this issue, the City asserts, as an alternate basis to affirm the judgment, that the City had never previously, and did not intend to here, enter "into a contract whereby it undertakes a duty to repair private property for damage not caused by the need to fix the City's sewer line." Because Anchor "understood the City to be assuming a far broader obligation, protecting Anchor's parking lot regardless of whether sewer repairs required it," the City argues there was no meeting of the minds during contract formation and the contract is thus unenforceable.

¶ 29 For a contract to be enforceable, the parties must mutually assent to the contract's terms. *Arbogast v. Chicago Cubs Baseball Club, LLC*, 2021 IL App (1st) 210526, ¶ 20. Whether parties have mutually assented to contract terms is judged "by an objective standard," so "it is not necessary that the parties share the same subjective understanding as to the contract's terms, as it suffices if their conduct objectively indicates an agreement to the terms of the purported contract." *Arbogast*, 2021 IL App (1st) 210526, ¶ 20. Importantly, "[o]nly the parties' overt acts and the communications between them may be considered in determining whether and upon what terms they have entered into a contract." *Arbogast*, 2021 IL App (1st) 210526, ¶ 20. "The most common way by which mutual assent can be shown is through a signature on a contract," and "[a] party who has signed a contract is charged with knowledge of and assent to its terms." *Arbogast*, 2021 IL App (1st) 210526, ¶ 21; see *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill. 2d 306, 314 (1987) ("Otherwise, a party would be free to avoid his contractual liabilities by simply denying that which his course of conduct indicates. As such, defendant's subjective understanding of the terms of the contract is immaterial.").

¶ 30    Here, merely because the City contends it did not have the same subjective understanding of the meaning of paragraph 2(c) as Anchor does not mean that there was no mutual assent between the parties as to the Agreement. The terms were written, and both parties signed the Agreement. The City is thus "charged with knowledge of and assent to its terms." *Arbogast*, 2021 IL App (1st) 210526, ¶ 21.

¶ 31    Because the contract is enforceable, we must next examine whether paragraph 2 is unambiguous. Paragraph 2 provides,

> "[S]hould the subject sewer line or main require repair, the City will conduct the necessary repairs, at its cost. Further, the City shall repair, at its cost, any damage to Anchor's driveway and parking lot pavement necessitated by (a) any such sewer repairs, (b) rupture of the sewer line as a result of freezing or (c) any other occurrence related to the sewer line or main, not caused by Anchor's gross negligence or intentional act."

The key question is what the parties intended by the phrase in paragraph 2(c), "any other occurrence related to the sewer line or main, not caused by Anchor's gross negligence or intentional act."

¶ 32    Though broad, paragraph 2(c) is unambiguous and covers the occurrence at issue here—the concrete cracking due to temperature differentials between the sewer pipe and the surrounding ground. Though the City contends that the Agreement was only supposed to cover repairs to the pipe in case of freezing or bursting, that position is untenable in light of the explicit language of the contract. Paragraph 2(a) addresses the possibility of "sewer repairs," and paragraph 2(b) addresses the possibility of the "rupture of the sewer line as a result of freezing." As paragraph 2(c) cannot be rendered meaningless, it must address occurrences *other* than sewer repairs, rupture,

and freezing. See *Thompson*, 241 Ill. 2d at 442. If the City meant for the Agreement to cover solely sewer repairs, it could have negotiated the removal or modification of paragraph 2(c) so that the explicit provisions of the Agreement comported with that intent and understanding. Here, the parties agree that the concrete cracking was caused by the ground heaving because of a temperature differential between the sewer pipe and the surrounding ground. Neither party contests the trial court's finding that Anchor did not negligently or intentionally cause the concrete to crack. Thus, the cracking is an "occurrence related to the sewer line or main, not caused by Anchor's gross negligence or intentional act." The City is required to repair the concrete at its cost, if Anchor is not precluded from enforcing the Agreement due to its own material breach of paragraph 3.

¶ 33                                B. Paragraph 3

¶ 34        Anchor contends that paragraph 3 clearly and unambiguously does not require it to raise the grade and add insulation. Anchor believes that paragraph 3 is for the protection of the sewer pipe, not Anchor's concrete, and interpreting it otherwise would result in "Anchor owing a duty to protect its own concrete," which is "an absurd result and legally impermissible." The City asserts that the trial court properly determined that paragraph 3 was ambiguous and must thus be construed against Anchor as the drafter.

¶ 35        In order "to recover on a breach of contract claim, the party must have performed its part of the contract." *PML Development LLC v. Village of Hawthorn Woods*, 2023 IL 128770, ¶ 50. "The first-to-breach rule excuses a party's duty to perform under the contract if the other party materially breaches the agreement first." *PML Development*, 2023 IL 128770, ¶ 50. On the other hand, "the first breaching party cannot seek to enforce the contract against the injured party." *PML Development*, 2023 IL 128770, ¶ 50. Thus, if the Agreement required Anchor to raise the

grade and add insulation and Anchor committed a material beach by failing to do so, it may not be able to enforce the contract against the City.

¶ 36        1. *Did the Agreement Require Anchor to Raise the Grade and Add Insulation?*

¶ 37        We must first determine if the contract language is unambiguous. Paragraph 3 provides,

> "To the best of its ability, in accordance with its plans to construct a building at the Anchor Property, as determined by [Anchor] in its discretion, it will raise the grade in the area surrounding the sewer line, and place fibre [*sic*] board insulation over the pipe trench."

¶ 38        Anchor argues that its only obligation under this provision was to *consider* raising the grade and adding insulation. But the Agreement does not say that Anchor need only consider doing those things, and it says at one point that Anchor "will" do them. Contrary to what Anchor suggests, we cannot read the word "consider" into paragraph 3. See *Thompson*, 241 Ill. 2d at 449 ("[A] court cannot alter, change or modify existing terms of a contract, or add new terms or conditions to which the parties do not appear to have assented.").

¶ 39        However, paragraph 3 also provides that Anchor will raise the grade and add insulation "in accordance with its plans to construct a building at the Anchor Property." Does this language mean that Anchor will raise the grade and add insulation only if doing so does not require modifying any of Anchor's existing construction plans? Or does it mean that Anchor will raise the grade and add insulation so long as doing so does not interfere with the construction of the building itself? The answer is not apparent from the plain language of the Agreement.

¶ 40        Complicating the analysis is that paragraph 3 also provides that Anchor will raise the grade and place insulation "[t]o the best of its ability." This phrase is very vague. In fact, some

Illinois courts have found that "the phrase 'best efforts' is too indefinite and uncertain to be an enforceable standard." *Penzell v. Taylor*, 219 Ill. App. 3d 680, 688 (1991); see *Kraftco Corp. v. Kolbus*, 1 Ill. App. 3d 635, 639-40 (1971) ("The mere allegation of best efforts is too indefinite and uncertain to be an enforceable standard."). In other cases, Illinois courts have held that the "phrase 'best efforts' was the equivalent of 'reasonable efforts.' " *Wells*, 2021 IL App (5th) 190460, ¶ 35 (collecting cases). In *Wells*, the appellate court ruled that "a rational trier of fact could find that reasonable efforts to maintain heat in the building would necessarily require some effort on the part of the plaintiffs to restore the building's heating system to proper working condition." *Wells*, 2021 IL App (5th) 190460, ¶ 42. Under the circumstances here, the requirement for Anchor to take some action "[t]o the best of its ability" does little to clarify the meaning of paragraph 3.

¶ 41   The final complication is that paragraph 3 states that Anchor will undertake these improvements "in its discretion." Of course, this is diametrically opposed to the notion that Anchor "will" make those improvements. Viewed in isolation, the phrase "in its discretion" could be interpreted to mean that Anchor had the ultimate authority to decide whether to make the improvements. But if that is the case, the phrase would also implicate Anchor's duty of good faith and fair dealing, which is implied in every contract. *Bank One, Springfield v. Roscetti*, 309 Ill. App. 3d 1048, 1059 (1999); see *McCleary v. Wells Fargo Securities, L.L.C.*, 2015 IL App (1st) 141287, ¶ 19 ("Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract."). This goes hand in hand with the "best efforts" phrase, as "[a] 'best efforts' undertaking is similar to the exercise of good faith implied in all contracts." *Coleman v. Madison Two Associates*, 307 Ill. App. 3d 570, 578 (1999).

¶ 42   Ultimately, the language of paragraph 3 is poorly drafted, self-contradictory, and ambiguous. Anchor insists that paragraph 3 imposed no duty on it beyond merely considering

whether to raise the grade and place insulation. However, that is not at all clear from the language of the Agreement.

¶ 43    Because paragraph 3 is ambiguous, we can consider extrinsic evidence to discern the parties' intent. *Thompson*, 241 Ill. 2d at 441. Before entering into the Agreement, Kane e-mailed Edmunds and stated,

> "If possible, it would be beneficial to raise grades in this section of the parking lot at least another foot or so for protection of the pipe. However, the pipe in this main is rated high enough to carry the proposed traffic loads. In addition, the placement of fiber board insulation over the pipe trench would also provide an additional layer of protection for the pipe."

The use of the phrase "[i]f possible" implies that the idea of raising the grade and adding insulation was initially merely a suggestion, not a requirement. However, Anchor, as the drafter of the Agreement, chose to include paragraph 3 in the contract and used the word "will" at one point, elevating what was potentially just a suggestion into a contractual obligation. We reiterate that we "will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used." *Thompson*, 241 Ill. 2d at 442. Paragraph 3 must therefore impose *some* obligation on Anchor; otherwise, it would be meaningless.

¶ 44    Because the language of the contract is ambiguous and extrinsic evidence around the time of contract formation does not clarify it, we turn to two principles to do so. First, any ambiguity must "be strictly construed against the drafter." *Central Illinois Light*, 213 Ill. 2d at 153. Anchor does not contest that it drafted the Agreement.

¶ 45    Next, we consider the duty of good faith and fair dealing, as mentioned above. Whether a party complied with their obligation of good faith can be used "to determine the intent of the parties where a contract is susceptible to two conflicting constructions." *Coleman*, 307 Ill. App. 3d at 578. This duty " 'ensure[s] that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.' " *McCleary*, 2015 IL App (1st) 141287, ¶ 19 (quoting *RBS Citizens, National Ass'n v. RTG-Oak Lawn, LLC*, 407 Ill. App. 3d 183, 191 (2011)). Under this doctrine, a "party vested with contractual discretion" must "exercise [that discretion] reasonably, and he may not do so arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties." *Bank One*, 309 Ill. App. 3d at 1059-60. Importantly for our review, "whether a party has satisfied its 'best efforts' or good faith obligation is one of fact." *Coleman*, 307 Ill. App. 3d at 578. We must thus "defer to the circuit court's findings unless they are against the manifest weight of the evidence," which occurs only "if the opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on the evidence." *Wells*, 2021 IL App (5th) 190460, ¶ 38.

¶ 46    Here, though the trial court did not explicitly use the term "good faith," it essentially found that Anchor did not satisfy its good-faith obligation. The court found that Edmunds did not have "any intention of doing anything," ultimately did nothing, "and certainly not to the best of his ability." The court further found that it was "clear [that Edmunds] was relying on the agreement" in deciding not to raise the grade and add insulation, as Edmunds "viewed this agreement as an insurance policy to protect himself, and it's not." Overall, the court interpreted paragraph 3 to mean that Anchor "had to do something," based on the use of the word "will," and that Edmunds had discretion as to "how [to raise the grade and add insulation] to the best of his

- 17 -

ability, not whether or not he can decide to do nothing." This is a reasonable interpretation of an ambiguous contractual provision in light of the facts presented at trial, and we cannot say that this finding was against the manifest weight of the evidence.

¶ 47    Edmunds's explanation for his decision not to raise the grade or add insulation supports a finding that he acted "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties." *Bank One*, 309 Ill. App. 3d at 1060. Anchor never even notified the City of its decision not to raise the grade and add insulation before it poured the concrete parking lot. Moreover, we agree with the trial court that Edmunds relied on his interpretation of the Agreement as an "insurance policy"—Edmunds seemingly decided not to make the contemplated improvements because he expected to be able to pass off any consequences and costs onto the City. This conclusion is reinforced by Edmunds's testimony that had Kane not signed the Agreement, Anchor would have stopped construction. Edmunds's decision was also potentially capricious, as he admitted he also considered that the City denied his request to move the sewer pipe, even at a cost share. He thus may have felt justified in passing off the cost to the City because he felt any future issues could have been avoided had the City agreed to move the pipe.

¶ 48    Notably, there is very little evidence in the record that would support a conclusion that Anchor exhibited good faith in investigating the possibility of raising the grade and adding insulation. Edmunds's and Sorensen's trial testimony established that Anchor had some discussions with its general contractor and subcontractors about taking these steps. However, Sorensen also testified that he could not remember whether he discussed with Anchor the possibility of raising the foundation. Additionally, Anchor failed to present any evidence about the extent of the burden that raising the grade and adding insulation would create. Edmunds merely

- 18 -

claimed that doing so would be expensive and outside of their "limited budget." Thus, we have no basis to disturb the trial court's findings about whether Anchor truly acted "[t]o the best of its ability."

¶ 49    Though Edmunds also testified that he considered that the pipe would remain above the frost line even with a raised grade, there was no evidence that raising the grade would be a useless act, as the cracked concrete was not caused by the pipe freezing. See *First American Discount Corp. v. Jacobs*, 324 Ill. App. 3d 997, 1012 (2001) (finding that a broker was not required to make an "unquestionably futile" margin call "where the market was undisputably in steep decline"); *O'Neill v. Director of the Illinois Department of State Police*, 2015 IL App (3d) 140011, ¶ 19 (finding that a party's appeal to the Department of State Police would be useless where "[t]he Department informed [the party] that it would not grant relief"). Here, by contrast, there is a dispute about whether the act would be useless, and the record reasonably supports a conclusion that raising the grade and placing insulation would have prevented the concrete from cracking. Kane testified to his belief that raising the grade and placing insulation over the pipe may have prevented the temperature differentials between the pipe and the surrounding ground that caused the ground to heave and the concrete to crack. Other than reiterating that the pipe would remain above the frost line—without any evidence as to the relationship between the frost line and the ground heaving—Anchor did not contest Kane's testimony. We thus cannot say that raising the grade and adding insulation would have been a useless act.

¶ 50    We disagree with Anchor's contention that the trial court effectively determined that Anchor owed a duty to itself. We find *Wells* instructive. In *Wells*, the appellate court considered an insurance policy that excluded coverage for water damage caused by freezing unless the plaintiffs did their " 'best to maintain heat in the building or structure.' " (Emphasis omitted.)

*Wells*, 2021 IL App (5th) 190460, ¶ 4. The court found that "reasonable efforts to maintain heat in the building would require some effort to restore the building's heating system to a condition where it could adequately heat the *entire* building sufficiently to prevent the building's pipes from bursting." (Emphasis in original.) *Wells*, 2021 IL App (5th) 190460, ¶ 44. Ultimately, the court found that the "plaintiffs were not required to repair the building's heating system, but when they elected not to do so and decided to turn on the building's water under these circumstances, they turned on the water to the building at their own risk of loss from burst water pipes." *Wells*, 2021 IL App (5th) 190460, ¶ 50. This did not somehow create a duty of the plaintiffs to themselves to ensure the loss was covered by the insurance contract; the plaintiffs merely had to comply with the contract to be able to recover. The same is true here. Even if the Agreement did not explicitly require Anchor to raise the grade by a foot and a half and add six inches of fiberboard insulation, the "best efforts" phrase in paragraph 3 required some good-faith efforts. When Anchor chose not to take any action to protect the pipe or the concrete before pouring the concrete parking lot, it did so at its own risk of loss by not complying with paragraph 3 in good faith.

¶ 51 Finding otherwise would be "inconsistent with the reasonable expectation of the parties" (*Bank One*, 309 Ill. App. 3d at 1060) and "destroy the [City's] right to receive the benefit of the contract" (Internal quotation marks omitted.) (*McCleary*, 2015 IL App (1st) 141287, ¶ 19). Paragraph 3 of the Agreement created a reasonable expectation, from the City's perspective, that Anchor would undertake these improvements to minimize the risk of the City having to pay for damage to Anchor's property. Anchor's decision not to raise the grade and add insulation, expecting the City to pay for any future issues that arose with the pipe or the concrete, was inconsistent with the City's reasonable expectation that Anchor would take the contemplated steps

to reduce future financial harm to the City. Thus, ultimately, the record supports a conclusion that Anchor did not comply with its duty of good faith.

¶ 52 Because paragraph 3 is ambiguous, Anchor drafted that provision, and Anchor failed to comply with its duty of good faith, the Agreement must be construed against Anchor. It was thus not against the manifest weight of the evidence for the trial court to find that the Agreement gave Anchor discretion in *how* to raise the grade and add insulation, not *whether* to do so—in other words, the Agreement required Anchor to undertake *some* action to protect the pipe. See *Wells*, 2021 IL App (5th) 190460, ¶ 44. Given the evidence that Anchor did nothing more than reject the possibility of raising the grade and adding insulation with the expectation that the City would bear the consequences, the court's finding that Anchor failed to take any action to comply with paragraph 3 was likewise not against the manifest weight of the evidence.

¶ 53 2. *Was Anchor's Breach of Paragraph 3 Material?*

¶ 54 Lastly, we must determine whether Anchor's failure to comply with paragraph 3 materially breached the Agreement. A party's "breach is material when it is 'so substantial and fundamental as to defeat the objects of the parties in making the agreement' or when the 'failure to perform renders performance of the rest of the contract different in substance from the original agreement.' " *Direct Auto Insurance Co. v. O'Neal*, 2022 IL App (1st) 211568, ¶ 15 (quoting *Village of Fox Lake v. Aetna Casualty & Surety Co.*, 178 Ill. App. 3d 887, 900-01 (1989)). Additionally,

> "[t]he materiality of a breach depends on
>
>> 'whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and

- 21 -

whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.' " *Direct Auto Insurance Co.*, 2022 IL App (1st) 211568, ¶ 15 (quoting *William Blair & Co. v. FI Liquidation Corp.*, 358 Ill. App. 3d 324, 346-47 (2005)).

Whether a breach was material is a question of fact, and the trial court's findings will not be reversed unless they were against the manifest weight of the evidence. *Direct Auto Insurance Co.*, 2022 IL App (1st) 211568, ¶ 15.

¶ 55 Here, the trial court apparently found the breach to be material, though it did not explain its rationale. In considering the entire record, we do not believe this finding was against the manifest weight of the evidence. Anchor's decision not to raise the grade and add insulation was based largely on (1) its assumption that it could simply pass off to the City the cost of any repairs to the concrete caused by any occurrence related to the sewer pipe and (2) its potential capriciousness due to the City's refusal to relocate the sewer pipe. Allowing Anchor to take no action while forcing the City to repair the concrete at its cost, potentially due to Anchor's failure to insulate the pipe despite promising otherwise, would "cause[ ] disproportionate prejudice" to the City and cause Anchor to receive "an unreasonable or unfair advantage." (Internal quotation marks omitted.) *Direct Auto Insurance Co.*, 2022 IL App (1st) 211568, ¶ 15. We agree with the trial court that Anchor's failure to comply with paragraph 3 ultimately materially breached the contract and precluded Anchor from enforcing paragraph 2(c) of the Agreement against the City. *PML Development*, 2023 IL 128770, ¶ 50.

¶ 56                                III. CONCLUSION

¶ 57 For the reasons stated, we affirm the trial court's judgment.

¶ 58    Affirmed.